T.C. Memo. 1997-4


UNITED STATES TAX COURT


ESTATE OF EMERSON WINKLER, DECEASED, THOMAS WINKLER AND
DARRELL S. WINKLER, CO-EXECUTORS, ET AL., Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 6510-95, 6523-95,    Filed January 2, 1997.
6524-95.


<u>Robert Kopf, Jr.</u>, <u>Jill Fisher</u>, and <u>R. Dell Zeigler</u>,
for petitioners.

<u>Michael Bitner</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


WHALEN, <u>Judge</u>:  Respondent determined the following

deficiencies in, and penalties on, petitioners' taxes:

|  | Year | Gift Tax | Estate Tax | Penalty Sec. 6662(a) |
|---|---|---|---|---|
| Elizabeth Winkler | 1989 | $58,596 | -- | $23,438 |
| Estate of Emerson Winkler | -- | 58,596 | -- | 23,438 |
| Estate of Emerson Winkler | -- | -- | $294,333 | |

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during 1989 or at the time of the decedent's death.

Respondent determined a gift tax deficiency in the case of Mrs. Elizabeth Winkler based on a finding that Mrs. Winkler made taxable gifts in 1989 of one-half of the value of a winning lottery ticket. Respondent also determined a gift tax deficiency in the case of her deceased husband, Mr. Emerson Winkler, by reason of his consent to split the gifts made by Mrs. Winkler pursuant to section 2513(a). Due to the increase in Mr. Winkler's lifetime taxable gifts, respondent also determined a deficiency in estate tax in the case of the Estate of Emerson Winkler.

The primary issue for decision is whether Mrs. Winkler purchased a winning lottery ticket on her own behalf or on the behalf of a family partnership. If we find that Mrs. Winkler purchased the ticket on her own behalf, then we must also determine whether the Estate of Emerson Winkler is entitled to increase the marital deduction

claimed for estate tax purposes by the amount of Mr. Winkler's interest in a family partnership on the ground that Mrs. Winkler's disclaimer of that interest was invalid.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the instant petitions were filed, Mrs. Elizabeth Winkler and the co-executors of the Estate of Emerson Winkler were residents of the State of Illinois, and the Estate of Emerson Winkler was being administered in the State of Illinois.

Mr. and Mrs. Winkler had been married for over 50 years prior to Mr. Winkler's death on March 11, 1992. Both Mr. and Mrs. Winkler graduated from high school but neither received any other formal education. When he died, Mr. Winkler was a retired farmer, and the couple was living on the family farm in Armington, Illinois.

Mr. and Mrs. Winkler had five children during their marriage: Ms. Charlotte Sutter, Ms. Susan Litwiller, Ms. Sharon Swartzendruber, Mr. Thomas Winkler, and Mr. Darrell (Steve) Winkler. The Winklers were a very close family. All of the children but Steve lived within

a short distance from Mr. and Mrs. Winkler's home and gathered at their parents' home almost every Sunday. Steve Winkler lived approximately 2 hours away from Mr. and Mrs. Winkler's home and came to the family gatherings about every other week.

Mr. Winkler was in poor health in 1989. His medical condition necessitated frequent trips to the Carle Clinic in Champaign, Illinois, and the Mayo Clinic in Rochester, Minnesota. The Carle Clinic is approximately 2 hours from the Winklers' home by car, and the Mayo Clinic is approximately 8 hours away. Generally, Mrs. Winkler and one or more of the Winkler children would drive Mr. Winkler to his appointments at the clinics. Mrs. Winkler and her children also made frequent trips to visit Mr. Winkler when he was hospitalized.

During 1989, the State of Illinois operated a weekly lottery game known as "Lotto". Lotto tickets cost one dollar each and contained a combination of six numbers. Every Saturday night, the Illinois Department of the Lottery conducted a drawing during which six numbers were selected at random. If the six numbers selected during the drawing matched the six numbers on a Lotto ticket, the holder of the ticket won the "grand prize" for the week of the drawing. If more than one winning ticket had been

issued during a given week, the grand prize was divided evenly between or among the winning ticket holders.

On one occasion when Mr. and Mrs. Winkler and one or more of their children stopped for fuel while returning from the Carle Clinic, someone suggested that they purchase Lotto tickets. It quickly became a family routine that on trips to or from a clinic, whichever family members were in the car would purchase three Lotto tickets when they stopped for fuel. Any family member who happened to have a dollar bill would contribute toward the purchase of the tickets, and the driver would usually go into the store to purchase the tickets. After obtaining the tickets, the driver would hand them to Mr. Winkler, who would inspect them and comment on the numbers. Mr. Winkler would then give them to Mrs. Winkler for safekeeping. Upon returning home, Mrs. Winkler would invariably place the tickets in a glass bowl in a china cabinet where the Winklers stored most of their important family documents and keepsakes. On Saturday night or Sunday morning, Mr. and Mrs. Winkler would check the numbers on the tickets against those selected during the weekly drawing.

Family members referred to the Lotto tickets purchased in the manner described above as "family tickets", and regarded them as being owned by the entire family. None of

the Winklers maintained a record of exactly how much each family member contributed toward the purchase of Lotto tickets. However, each of the Winkler children and Mr. and Mrs. Winkler both paid for and went into the store to purchase Lotto tickets on more than one occasion. The Winklers had no specific agreement as to how any potential winnings would be divided among them. However, the Winklers often discussed what they would do with any winnings, and each family member enjoyed describing what he or she would do with his or her separate portion of the winnings. In this way, the purchase of Lotto tickets became a diversion for the family during Mr. Winkler's illness.

Mrs. Winkler never purchased any Lotto tickets for herself, and never purchased any tickets when she was alone. Some of the Winkler children occasionally purchased Lotto tickets for themselves, and considered such tickets to be their separate property. The children always kept Lotto tickets purchased for themselves in their separate possession. On the other hand, when a family member purchased family tickets, he or she always purchased three tickets and always gave them to Mrs. Winkler for storage in the china cabinet.

On Saturday, March 4, 1989, Mrs. Winkler and her daughter Charlotte went to buy flowers for a friend who was in the hospital. Charlotte reminded Mrs. Winkler that they had not purchased the family Lotto tickets on their way home from the Mayo Clinic the night before and suggested that they stop at a gas station to purchase tickets before the Saturday night drawing. Mrs. Winkler initially said that she was too tired, but Charlotte eventually convinced her to stop. Mrs. Winkler purchased all three tickets with her own money. She selected the numbers on the tickets using the "quick pick" option, which caused a computer to generate a group of six random numbers on each ticket. Mrs. Winkler then took the tickets home and placed them in the china cabinet where she kept the family tickets. Charlotte also purchased a Lotto ticket for herself at the gas station, but she kept this ticket separate from the family tickets.

On the morning of Sunday, March 5, 1989, Mr. and Mrs. Winkler listened when the winning numbers were announced on the radio. Mrs. Winkler wrote the numbers down and later checked them against the numbers on the tickets she had purchased the day before. Much to the Winklers' delight, one of the tickets bore all of the numbers announced from the weekly drawing. Disbelieving

that they could have won, Mrs. Winkler telephoned Charlotte and asked her to check the numbers listed in the Sunday newspaper. Charlotte verified in two separate newspapers that the Winklers had the winning ticket. Mr. Winkler then telephoned the other children and asked each of them to come to the farm early that day. As each of the children arrived, Mr. and Mrs. Winkler announced that they had won the grand prize.

Later that Sunday, the Winklers contacted Mr. Darrel Oehler, a local accountant who had grown up with the Winkler children, and asked him to come to the house the following morning. On Monday, March 6, the Winkler family met with Mr. Oehler and told him that they had won the weekly Lotto grand prize. Mr. Oehler advised the Winklers to discuss the matter with an attorney. Following this advice, the Winklers met with a local attorney, Mr. Ralph Turner, later that same day.

During 1989, the Illinois Department of the Lottery required a written partnership agreement before it would distribute Lotto winnings to more than one individual or entity. If a "partnership ticket" was presented for payment without an accompanying written partnership agreement, the Lottery Department would provide a pro forma agreement to the ticket holder and suggest that he or she

obtain the advice of an accountant or attorney. Because of this requirement, Mr. Turner advised the Winklers to enter into a written partnership agreement to memorialize their understanding as to how the proceeds should be divided.

During their meeting with Mr. Turner, the Winklers agreed among themselves that Mr. and Mrs. Winkler should each receive 25 percent of the winnings, and that each of the five children should receive 10 percent. Mr. Turner then drafted a partnership agreement for the "E & E Family Partnership" to reflect this understanding. The partnership agreement provides as follows:

### PARTNERSHIP AGREEMENT

This agreement is entered into on March 4, 1989, by EMERSON WINKLER, ELIZABETH WINKLER, THOMAS WINKLER, CHARLOTTE SUTTER, SHARON SWARTZENDRUBER, SUSAN LITWILLER, and DARRELL WINKLER, collectively referred to as "partners" and individually as "partner".

1. Name and Purpose. The partnership shall be carried on under the name of E & E FAMILY PARTNERSHIP. The partnership has been formed to memorialize the family's understanding concerning the purchase of lottery tickets. Tickets purchased were for the benefit of the family rather than the individual who purchased the ticket.

2. Mailing Address. * * *

3. Winnings. In the event a ticket purchased shall win, the payee shall be the partnership and the partnership's income and capital shall be distributed as follows:

| | |
|---|---|
| Emerson Winkler | 25% |
| Elizabeth Winkler | 25% |
| Thomas Winkler | 10% |
| Charlotte Sutter | 10% |
| Sharon Swartzendruber | 10% |
| Susan Litwiller | 10% |
| Darrell Winkler | 10% |

4. Death of a Partner. In the event that a partner should die, the partner's share of partnership distributions shall be paid to his or her estate.

5. Binding Affect [sic]. This agreement shall inure to the benefit of, and be binding upon the parties hereto and their respective heirs, legatees, administrators, executors, legal representatives, successors and permitted assigns.

6. Amendments. Amendments to this agreement shall become effective only if in writing, signed by all the partners.

Although the partnership agreement is dated March 4, 1989, the agreement was not executed until March 8, 1989.

On March 10, 1989, the E & E Family Partnership claimed the proceeds of the Lotto drawing. On or about March 16, 1989, the Illinois Department of the Lottery approved the E & E Family Partnership agreement and authorized payment of the proceeds to the partnership. The Winklers were the sole winners of the weekly grand prize of $6,463,166, which was to be paid in 20 annual installments.

On February 12, 1990, Mr. and Mrs. Winkler each filed a United States Gift (and Generation-Skipping Transfer) Tax

Return on Form 709. Both returns were prepared by a tax advisor. Mrs. Winkler's return reported total gifts of $50,000.50. This included a gift of $.10 to each of her five children that was labeled "Illinois Lottery Ticket #0634-8455-9267 dated March 4, 1989". It also included a gift of $10,000 in cash to each of the children. Mrs. Winkler's return reports that these cash gifts had been made on December 16, 1989. Mr. Winkler reported total gifts of $51,861. This included a gift of $10,002 in cash to each of his five children, and a gift of the value of a trip to Florida to four of the children. Mr. Winkler's return reports that these gifts had been made on December 23, 1989.

Mr. and Mrs. Winkler each consented to split the gifts of the other, (i.e., to treat all of the gifts as having been made one-half by each of them) pursuant to section 2513. After excluding $10,000 of gifts to each donee pursuant to section 2503(b), Mr. and Mrs. Winkler each reported taxable gifts of $930.75.

Mr. Winkler died on March 11, 1992. Mr. Winkler's will was filed with the Tazewell County Circuit Clerk of the Tenth Judicial Circuit of Illinois on November 3, 1992. In his will, Mr. Winkler left all of his tangible personal property to his wife provided that she survive his death.

In the event that Mrs. Winkler failed to survive him, Mr. Winkler left all of his tangible personal property to his children per stirpes.  Mr. Winkler left the residue of his estate to the "Trustee of the Trust Estate", naming Mrs. Elizabeth Winkler as the Trustee.  He directed the Trustee to create two separate trusts:  A marital trust and a residuary trust.

Mr. Winkler's will directs the Trustee to fund the marital trust as follows:

> A.  If my wife is living at my death, then as of the date of my death the Trustee shall set out of the trust estate a separate trust, herein called the marital trust, and shall allocate to such trust that amount of eligible trust property which will result in the least federal estate tax being payable because of my death but not more than the smallest amount that will result in no such tax.  The Trustee shall determine this amount after giving effect to the exercise or proposed exercise of tax elections and shall take into account prior taxable gifts of the testator and the federal credit for state death taxes only to the extent that state death taxes are not thereby incurred or increased.

The will instructs the Trustee to distribute property from this trust as follows:

> (1)  Commencing with the date of my death, all of the income from this marital trust shall be paid to my wife, W. ELIZABETH WINKLER, in convenient installments, but at least as often as annually, during her lifetime.

(2) During the life of my said wife, the trustee shall distribute all or any portion of the principal of the marital trust to any persons, including herself, whom my said wife may from time to time appoint by instrument in writing and deliver to the Trustee in her lifetime. Any appointment by my wife may be of such estates and interests and upon such terms, trusts and conditions as my wife shall determine.

        *     *     *     *     *     *     *

(5) If my wife survives me but disclaims any part or all of the property which would otherwise be held in the marital trust, I give such disclaimed property to the Trustee of the residuary trust to be administered as part thereof for the benefit of those persons, including my wife, referred to thereunder.

Mr. Winkler's will further directs that the balance of the Trust Estate (i.e., the portion not allocated to the marital trust) be held in a separate trust which he termed the "residuary trust". The residuary trust is governed by the following provisions:

A. Commencing with the date of my death, the Trustee shall pay to my wife, W. ELIZABETH WINKLER, the net income of the residuary trust in convenient installments during the remainder of her lifetime, at least as often as annually. If, at any time, or from time to time, in the sole opinion of the Trustee, the income payable to my wife, together with such other funds available to her from other sources, and known to the Trustee, is insufficient for the following purposes, the Trustee may pay to her from principal such amounts as the Trustee, in the Trustee's discretion, deems necessary for her needs for support, maintenance and health, including hospital and institutional care.

B.   Upon the death of my wife (or upon my death if she shall predecease me), the residuary trust shall terminate, whereupon the Trustee shall distribute all accrued or undistributed net income of the residuary trust to the estate of my wife.  The Trustee shall distribute the then principal of the trust per stirpes to my descendants then living, except as provided in Section IV [which creates separate trusts for minor beneficiaries].

Mr. Winkler's will further clarifies his intent concerning the interaction between the marital and residuary trust as follows:

I intend that the gift to the marital trust qualify under the marital deduction provisions of the federal estate tax law applicable to my estate (except to the extent not elected by my Executor under the powers given to my Executor herein), and all provisions of this Will shall, accordingly, be construed to carry out that intent.  More specifically, if any provision of my Will or any power (other than the powers to which reference is made in the preceding sentence), right, direction or discretion granted to the Trustee or my Executor hereunder shall cause the loss of the marital deduction, then such provision or grant shall be void and of no effect as to the marital trust.

On or about December 10, 1992, the Estate of Emerson Winkler filed a United States Estate (and Generation-Skipping Transfer) Tax Return, Form 706.  The return reported a total gross estate of $1,519,156.55 consisting primarily of farm land and associated buildings located in Tazewell County, Illinois, valued at $685,060, and

Mr. Winkler's 25-percent interest in the E & E Family Partnership, valued at $714,750.55.

Attached to the estate tax return is a Schedule F-- Other Miscellaneous Property Not Reportable Under Any Other Schedule, which reports the following property:

```
9.      25% INTEREST IN E & E PARTNERSHIP - LOTTERY WINNINGS

        A.      25% OF LOTTERY WINNINGS VALUED PER ATTACHED  $714,750.55
        B.      25% OF TAZEWELL COUNTY NATIONAL BANK ACCOUNT        8.59
                  NUMBER 448-56-7
        C.      25% OF ACCOUNTS PAYABLE - TAX WORK               (75.94)
```

Schedule F is accompanied by a pleading which was filed on December 8, 1992, in the Circuit Court for Tazewell County, Illinois, In the Matter of the Estate of Emerson Winkler, Deceased.  This pleading states as follows:

### <u>DISCLAIMER OF DECEDENT'S 25% INTEREST IN<br>E & E PARTNERSHIP</u>

The undersigned, W. ELIZABETH WINKLER, hereby exercises her right pursuant to Ill. Rev. Stat. Chap. 110½, Sec. 2-7(a) to disclaim any claim and interest to the following property interest, to-wit:

Twenty-five percent (25%) interest of Decedent, EMERSON WINKLER, in E & E PARTNERSHIP, an Illinois partnership.

The undersigned has received no benefits in connection with the disclaimed asset.

This disclaimer is irrevocable and is binding upon the disclaimant and all persons claiming by, through and under the disclaimant.

This disclaimer is not barred by:

1.  a Judicial sale of the property, part or interest thereof;

2.  an assignment, conveyance, encumbrance, pledge, sale or other transfer of the property by the disclaimant;

3.  a written waiver of the right to disclaim of the undersigned; or an acceptance of the property by the disclaimant.

*     *     *     *     *     *     *

This disclaimer only covers the Twenty-Five percent (25%) partnership interest of Decedent, EMERSON WINKLER, and in no way affects W. ELIZABETH WINKLER's individual Twenty-Five percent (25%) interest in said partnership.

Schedule M--Bequests, etc., to Surviving Spouse, filed with the decedent's estate tax return, claimed a marital deduction in the amount of $754,153.07, consisting principally of the property which was distributed to the marital trust.  The property distributed to the marital trust includes the farm and farm machinery, but does not include Mr. Winkler's 25-percent interest in the E & E Family Partnership.

On Part 2 of Schedule M, the executors of the Estate made the following protective QTIP election:

The executors elect a specific portion of the residuary trust created under paragraph III of decedent's will.  The portion elected shall be represented by a fractional share of up to 100% of the combined residue of decedent's estate and any property disclaimed by the surviving spouse per paragraph II E(5) of the will that is

> required to reduce the federal estate tax on the
> decedent's federal estate tax return to the
> smallest amount possible based upon finally
> determined federal estate tax values, after
> taking into consideration all other items
> deducted on the federal estate tax return,
> administrative expenses deducted on the estate's
> fiduciary income tax returns, other property
> passing to the surviving spouse, prior taxable
> gifts, the allowable state death tax credit (to
> the extent that it does not increase the amount
> of death taxes payable to any state), and the
> unified credit.

The executors determined that "based on the return as filed," the value of the QTIP property that was needed to reduce the estate tax to the smallest amount was "0.00".

On February 2, 1995, respondent issued separate notices of deficiency to Mrs. Elizabeth Winkler and the Estate of Emerson Winkler. Respondent determined deficiencies in Mr. and Mrs. Winkler's gift tax for 1989 in the amount of $58,596 each. This determination is based on respondent's findings that Mrs. Winkler made gifts to her children of 50 percent of the winning Lotto ticket, and that Mr. Winkler consented to split the gifts pursuant to section 2513. Respondent determined the value of 50 percent of the winning ticket to be $1,514,014.35 and therefore increased the value of the total taxable gifts made by both Mr. and Mrs. Winkler by one-half that amount, $757,007.17.

Respondent also determined a deficiency of $281,038 in the Estate of Emerson Winkler's estate tax. Respondent reached this determination by increasing the value of Mr. Winkler's lifetime taxable gifts by $757,007, and by making adjustments to the marital deduction that are not disputed. Respondent did not recognize the Estate's protective QTIP election, and did not increase the marital deduction for any portion of the residuary trust.

OPINION

Respondent determined that Mrs. Winkler purchased the value of the winning Lotto ticket on her own behalf and made a gift of a 10-percent interest in the ticket to each of her five children. As mentioned above, respondent asserts that the aggregate value of these gifts, totaling 50 percent of the value of the winning ticket, is $1,514,014.35.

Petitioners argue that Mrs. Winkler purchased the winning ticket on behalf of a pre-existing family partnership. Petitioners contend that although the written E & E Family Partnership agreement was not executed until after the winning numbers were announced, an oral partnership agreement existed prior to the time Mrs. Winkler purchased the ticket. Thus, petitioners argue that each member of the Winkler family was entitled to receive a portion of the

proceeds of the winning ticket as his or her separate property, and Mrs. Winkler did not make a gift of any portion of the winning ticket to her children.

Petitioners also argue that an agreement to divide the proceeds of a winning lottery ticket should be respected for tax purposes even in the absence of an enforceable contract or valid partnership so long as the parties to the agreement actually perform. Finally, petitioners argue in the alternative that if the division of the lottery proceeds is determined to be a gift, the Estate of Emerson Winkler is entitled to an increased marital deduction because Mrs. Winkler's purported disclaimer of her husband's 25-percent interest in the E & E Family Partnership was ineffective.

In deciding this case, the threshold question that must be answered is whether there was a family partnership in existence at the time Mrs. Winkler purchased the winning ticket. If we determine that a valid partnership existed at that time, we must also decide whether Mrs. Winkler purchased the ticket on behalf of the partnership. Petitioners bear the burden of proving that Mrs. Winkler purchased the winning Lotto ticket on behalf of a partnership composed of the members of her immediate family. Rule 142(a).

Whether a valid partnership exists for Federal tax purposes is governed by Federal law.  See Commissioner v. Culbertson, 337 U.S. 733 (1949); Lusthaus v. Commissioner, 327 U.S. 293 (1946); Commissioner v. Tower, 327 U.S. 280 (1946); Evans v. Commissioner, 447 F.2d 547, 550 (7th Cir. 1971); Frazell v. Commissioner, 88 T.C. 1405, 1412 (1987); Wheeler v. Commissioner, T.C. Memo. 1978-208.  Section 761 of the Code defines the term "partnership" as follows:

> (a) PARTNERSHIP.--For purposes of this sub-
> title, the term "partnership" includes a
> syndicate, group, pool, joint venture or other
> unincorporated organization through or by means
> of which any business, financial operation, or
> venture is carried on, and which is not, within
> the meaning of this title [subtitle], a corpora-
> tion or a trust or estate. * * *

See also sec. 7701(a)(2).  The term "partnership" as defined by the Code is broader in scope than the common law meaning of partnership, and may include groups not traditionally considered partnerships.  Sec. 1.761-1(a), Income Tax Regs.; sec. 301.7701-3(a), Proced. & Admin. Regs.

A partnership is created "when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is a community of interest in the profits and losses." Commissioner v. Tower, supra at 286.  Generally, "each

partner contributes one or both of the ingredients of income--capital or services."  Commissioner v. Culbertson, 337 U.S. 733, 740 (1949).  In deciding whether two or more persons have formed a partnership:

> The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.  Id.

See Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964).

Recognition of a partnership for Federal tax purposes also requires that the parties conduct some business activity.  See Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 514-518 (7th Cir. 1980), affg. 72 T.C. 521 (1979); Frazell v. Commissioner, 88 T.C. 1405, 1412 (1987). For example, it is clear that neither joint ownership of property nor sharing of expenses, by itself, creates a partnership for Federal tax purposes.  Madison Gas & Elec. Co. v. Commissioner, supra; Estate of Appleby v. Commissioner, 41 B.T.A. 18, 20 (1940), affd. 123 F.2d 700 (2d Cir. 1941); Gabriel v. Commissioner, T.C. Memo. 1993-

524; <u>Marinos v. Commissioner</u>, T.C. Memo. 1989-492.  Sec.
1.761-1(a), Income Tax Regs.; sec. 301.7701-3(a), Proced.
& Admin. Regs.  The regulations in this regard provide as
follows:

> A joint undertaking merely to share expenses is
> not a partnership.  For example, if two or more
> persons jointly construct a ditch merely to drain
> surface water from their properties, they are not
> partners.  Mere co-ownership of property which is
> maintained, kept in repair, and rented or leased
> does not constitute a partnership.  For example,
> if an individual owner, or tenants in common, of
> farm property lease it to a farmer for a cash
> rental or a share of the crops, they do not
> necessarily create a partnership thereby.
> Tenants in common, however, may be partners if
> they actively carry on a trade, business,
> financial operation, or venture and divide the
> profits thereof.  For example, a partnership
> exists if co-owners of an apartment building
> lease space and in addition provide services to
> the occupants either directly or through an
> agent.  * * * [Sec. 1.761-1(a), Income Tax Regs.;
> see also sec. 301.7701-3(a), Proced. & Admin.
> Regs.]

In <u>Marinos v. Commissioner</u>, <u>supra</u>, this Court stated that
"The regulations and relevant case law indicate the
distinction between mere co-owners and co-owners who are
engaged in a partnership lies in the degree of business
activity of the co-owners or their agents."

In this case, based upon the credible testimony of
petitioners' witnesses, we find that the Winklers engaged
in the activity of pooling their money to purchase family

Lotto tickets.  We find that they conducted this activity
on a regular and consistent basis for more than a year
before March 4, 1989.  Thus, based upon all of the facts
and circumstances of this case, we find that the Winklers
in good faith and acting with a business purpose intended
to join together in the present conduct of an enterprise.
See Commissioner v. Culbertson, supra; Luna v. Commis-
sioner, supra.

At trial, respondent emphasized the fact that prior
to the time Mrs. Winkler purchased the winning ticket, the
Winklers did not have a specific agreement as to how they
would divide proceeds.  We do not find the absence of such
agreement to be fatal to the existence of a partnership
prior to the time Mrs. Winkler purchased the winning
ticket.  As the Supreme Court noted in Culbertson:

> If, upon a consideration of all the facts, it
> is found that the partners joined together in
> good faith to conduct a business, having agreed
> that the services or capital to be contributed
> presently by each is of such value to the
> partnership that the contributor should
> participate in the distribution of profits,
> that is sufficient.  [Commissioner v.
> Culbertson, supra at 744-745.]

In the case of a partnership composed of members of
the same family, section 704(e) provides that a person
shall be recognized as a partner if:  (1) The partnership

is one in which capital is a "material income-producing factor", and (2) the person "owns" the partnership interest. Ketter v. Commissioner, 70 T.C. 637, 643 (1978), affd. without published opinion, 605 F.2d 1209 (8th Cir. 1979); see also Elrod v. Commissioner, 87 T.C. 1046, 1070-1072 (1986). Section 704(e) states as follows:

> (e) Family Partnerships.--
>
>   (1) Recognition of interest created by purchase or gift.--A person shall be recognized as a partner for the purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

The purpose of section 704(e) is "to harmonize the rules governing interests in so-called family partnerships with those generally applicable to other forms of property or business". S. Rept. 781, 82d Cong., 1st Sess. 39 (1951), 1951-2 C.B. 458, 485; H. Rept. 586, 82d Cong., 1st Sess. 33 (1951), 1951-2 C.B. 357, 380-381. In the case of a family partnership which derives income from the ownership of property, as opposed to providing personal services, section 704(e) makes it clear that the income is taxable to the owner of a partnership interest if he or she is the real owner. This is true even if the owner acquired his or her partnership interest as an intra-family gift and performs no substantial services for the partnership.

Section 1.704-1(e)(1)(iv), Income Tax Regs., establishes the following test for determining whether capital is a "material income-producing factor":

> Capital as a material income-producing factor. For purposes of section 704(e)(1), the determination as to whether capital is a material income-producing factor must be made by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business conducted by the partnership. In general, capital is not a material income-producing factor where the income of the business consists primarily of fees, commissions, or other compensation for personal services performed by members or employees of the partnership. On the other hand, capital is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or a substantial investment in plant, machinery, or other equipment.

See generally, Ketter v. Commissioner, supra.

In viewing the fact that any income from the enterprise in this case would be attributable to the purchase of a winning Lotto ticket, or to the investment of the proceeds of a winning ticket, and none of the income would consist "of fees, commissions, or other compensation for personal services performed by members or employees of the partnership", it is clear that capital is a material income-producing factor in the enterprise. Sec. 1.704-1(e)(1)(iv), Income Tax Regs. Thus, pursuant to section

704(e), each member of the Winkler family shall be recognized as a partner if he or she owns a capital interest in the enterprise.  Sec. 704(e)(1).

Section 1.704-1(e)(2), Income Tax Regs., sets forth basic tests to determine "ownership".  These tests are designed to determine "Whether an alleged partner who is a donee of a capital interest in a partnership is the real owner of such capital interest, and whether the donee has dominion and control over such interest".  Id.  For this purpose, a capital "interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital."  Sec. 704(e)(3).  The basic tests fall into five categories:  Retained controls by the transferor of the partnership interest, indirect controls by the transferor, participation in management, income distributions, and conduct of partnership business.  Cirelli v. Commissioner, 82 T.C. 335, 345 (1984); sec. 1.704-1(e)(2), Income Tax Regs.  Whether a person "owns" a capital interest in a partnership is a mixed factual and legal issue to be determined from the totality of the circumstances. Pflugradt v. United States, 310 F.2d 412, 416 (7th Cir. 1962); Reynolds, T.C. Memo. 1987-261.

Considering all of the facts and circumstances, we find that each of the Winkler family members did in fact "own" a capital interest in the partnership prior to the time Mrs. Winkler purchased the winning ticket.  Each member of the family contributed capital in the form of dollar bills to purchase Lotto tickets on more than one occasion.  Each member of the family, except for Mr. Winkler, also contributed services on more than one occasion by going into the store to purchase the tickets. The family agreed among themselves that these contributions of capital and services were of such value to the partnership that the contributing family members should share in any winnings.  They also agreed to joint proprietorship and control over the tickets, and they agreed to share the proceeds of any winning ticket. Finally, each of the Winkler family members was treated as a partner at all times during the operation of the partnership.  For example, each member of the family attended the meetings with Mr. Oehler and Mr. Turner and had a say in formulating the written partnership agreement. Under these circumstances, we find that each of the family members actually owned a partnership interest as required by section 704(e).  Sec. 1.704-1(e)(2), Income Tax Regs. Cf. <u>Commissioner v. Culbertson</u>, 337 U.S. 733 (1949); <u>S & M</u>

Plumbing Co. v. Commissioner, 55 T.C. 702 (1971); Wheeler v. Commissioner, T.C. Memo. 1978-208.

The second factual question is whether Mrs. Winkler purchased the winning Lotto ticket on behalf of the pre-existing family partnership. Courts typically focus on the facts and circumstances surrounding the purchase of a lottery ticket, including the intent and understanding of the parties at the time of purchase, to determine ownership of the proceeds of the ticket for income tax purposes. See, e.g., Tavares v. Commissioner, 275 F.2d 369 (1st Cir. 1960), affg. 32 T.C. 591 (1959); Schultz v. Commissioner, T.C. Memo. 1977-67; Dowling v. Commissioner, T.C. Memo. 1959-169; Chelius v. Commissioner, T.C. Memo. 1958-29. For example, where a taxpayer purchases a lottery ticket with the intent and understanding that the proceeds will be shared with one or more other persons, the courts have treated the proceeds of the ticket as income to the recipients rather than as income to the purchaser. Solomon v. Commissioner, 25 T.C. 936 (1956); Huntington v. Commissioner, 35 B.T.A. 835 (1937); Droge v. Commissioner, 35 B.T.A. 829 (1937); Dowling v. Commissioner, T.C. Memo. 1959-169; Chelius v. Commissioner, supra. This is true even though the agreement to divide proceeds is void and unenforceable. Tavares v. Commissioner, supra; Dowling

v. Commissioner.  As this Court stated in Dowling v.

Commissioner, supra:

> The rule regularly applied in such circumstances
> is that where a ticket on a lottery is purchased
> in the name of one of two persons and they agree
> prior to the drawing to share any winnings, each
> person is taxable only upon his agreed share
> provided that the nominal owner in fact divides
> the proceeds in accordance with their agreement,
> even though the agreement be void and unenforce-
> able.  * * * [Dowling v. Commissioner, supra
> (citations omitted).]

The facts in this case are that Mrs. Winkler did not

normally play games of chance, and she never purchased

Lotto tickets other than the family tickets purchased in

the presence of other family members.  She purchased the

winning Lotto ticket as one of three "family tickets" on

March 4, 1989, while she was with her daughter, Charlotte.

She took the tickets home and placed them in a glass bowl

in the china cupboard, as was customary for family tickets.

Based upon the record in this case, we find that

Mrs. Winkler purchased the winning Lotto ticket on behalf

of the family partnership and not as her sole property.  In

making this finding, we are mindful of Mrs. Winkler's gift

tax return in which she took the position that she made

gifts to her children of the value of the ticket prior to

the time it was determined to be the winner (i.e., $.10 to

each child).  However, we accept Mrs. Winkler's testimony,

that she signed the gift tax return on an accountant's advice despite the fact that she did not intend to make a gift of the ticket, as credible and as consistent with the other facts and circumstances of this case.

Finally, we must determine the Winklers' respective partnership interests at the time Mrs. Winkler purchased the winning ticket. Normally, a partner's interest in the partnership is determined by the partnership agreement. Sec. 704(a); sec. 1.704-1(a), Income Tax Regs. In this case, there was no written partnership agreement when Mrs. Winkler purchased the winning ticket, and the members of the Winkler family had not yet agreed upon specific partnership interests. However, section 1.761-1(c), Income Tax Regs., provides that "As to any matter on which [a] partnership agreement, or any modification thereof, is silent, the provisions of local law shall be considered to constitute part of the agreement." See also sec. 1.704-1(b)(2)(ii)(h), Income Tax Regs. At all relevant times, the Illinois Uniform Partnership Act provided that absent agreement to the contrary:

> Each partner shall be repaid his contribution, whether by way of capital or advances to the partnership property and <u>share equally in the profits and surplus</u> remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise,

sustained by the partnership according to his share in the profits. [Ill. Ann. Stat. ch. 106½, par. 18(a) (Smith-Hurd 1987) (emphasis added).]

Accordingly, under section 1.761-1(c), Income Tax Regs., and the Illinois Uniform Partnership Act, the Winklers' partnership agreement as it existed at the time Mrs. Winkler purchased the winning ticket is deemed to have required an equal distribution of partnership profits and surplus. Therefore, at that time, each member of the Winkler family held a 1/7th, or a 14.29-percent, interest in the winning Lotto ticket through the partnership.

Under the written E & E Family Partnership agreement, Mr. and Mrs. Winkler each received a 25-percent interest in the "partnership's income and capital", and each of the five children received a 10-percent interest. Thus, under the E & E Family Partnership Agreement, Mr. and Mrs. Winkler each received a 10.71-percent greater interest, and each of the children received a 4.29-percent lesser interest in the partnership profits and surplus than would have been the case under the oral partnership agreement. In this situation, there is no basis on which we can find that Mrs. Winkler made a gift to her children and, accordingly, we reject respondent's determinations of gift tax deficiencies that are based upon a finding to the contrary.

Because we find that Mrs. Winkler did not make taxable gifts of interests in the winning Lotto ticket, there is no estate tax deficiency, and we need not address petitioners' alternative contention that the Estate of Emerson Winkler is entitled to an increased marital deduction. Based upon our finding that there are no tax deficiencies in this case, we hold that petitioners are not liable for the penalties under section 6662(a) that were determined by respondent in the subject notices of deficiency.

Decision will be entered for petitioners.