871 So.2d 54 (2002)
CITY OF DOTHAN
v.
EIGHTY-FOUR WEST, INC., and Quin E. Flowers, Jr.
2010683.
Court of Civil Appeals of Alabama.
November 22, 2002.
Opinion on Application for Rehearing February 21, 2003.
*55 F. Lenton White, Dothan, for appellant.
Jere C. Segrest and Kevin Walding of Hardwick, Hause & Segrest, Dothan, for appellees.
YATES, Presiding Judge.
This is the third time these parties have been before this court. See City of Dothan v. Eighty-Four West, Inc., 738 So.2d 903 (Ala.Civ.App.1999) ("Dothan I"), and *56 City of Dothan v. Eighty-Four West, Inc., 822 So.2d 1227 (Ala.Civ.App.2001), cert. denied, 822 So.2d 1237 (Ala.2001) ("Dothan II"), for a detailed factual and procedural history.
This litigation involves the ongoing efforts of Eighty-Four West, Inc., and Quin E. Flowers, Jr. (hereinafter collectively referred to as "the Flowers defendants"), to obtain approval from the City of Dothan ("the City") for the plat and construction plans for a subdivision known as the Grove Park Subdivision. This court stated in Dothan II:
"Simply because this court has affirmed the trial court's determination that any and all surface water should be allowed to drain through the easement and that Flowers is entitled to construct the dam on his property, there is no determination that the proposed plans for the subdivision's storm-water management system are adequate....
"It is for the City and its planning commission to consider the holding of this court and then to exercise the authority delegated to it by the legislature, based on its police power, and to determine whether the proposed storm-water management system is adequate."
822 So.2d at 1237.
After we issued our opinion in Dothan II, Flowers resubmitted the construction plans for phase II of the Grove Park Subdivision to the City for approval. Those plans included a design for a storm-water management system. The City requested from Alan Parker, an engineer employed with the design firm hired by Flowers to design the subdivision, additional storm-water analysis on the adequacy of the inlets and piping system in the subdivision because of a revised lot layout in the subdivision. This analysis was completed in the summer of 2001.
In a letter to Parker dated December 6, 2001, the City questioned what effect the dam Flowers was authorized to construct would have on the storm-water management system of the subdivision. The City noted previous sworn testimony from Bill Douty, the designer of the Grove Park subdivision, which indicated that if the dam was built in the proposed location at the proposed height, storm-water would run into the entrance of the subdivision, and if this were to happen, the proposed storm-water management system would be inadequate to handle the additional flow of water. In February 2002, the City requested additional storm-water analysis from the design firm with regard to the proposed dam. An interoffice report was completed by the design firm on February 18, 2002.
The construction plans for phase II were stamped "Approved for Construction" on December 27, 2001, and were signed by Alan Kramer, a civil engineer for the City. On that same date, Kramer wrote Parker. His letter stated, in part:
"I have reviewed and approved the construction plans and specifications (water, street, and sanitary sewer) for the above referenced subdivision. Please ensure that all prospective bidders, the contractor and all subcontractors receive a copy of the approved plans and specifications for this development. The contractor shall have a set of plans and specifications on site during any work activities. If you should need any additional sets of plans stamped `Approved for Construction' we will accommodate your needs."
Flowers responded by letter on January 3, 2002, stating, in part:
"I am in receipt of the copy of your letter dated December 27, 2001, to Alan Parker of Barge, Waggoner, Sumner and Cannon concerning your approval of *57 the construction plans for the 2nd Addition to Grove Park. Since you did not specifically approve the drainage plan as you did the other elements of construction, I would appreciate your prompt approval of that as well."
Kramer responded by letter on January 10, 2002, stating:
"This is to inform you that this office is unable to approve the stormwater design for the Second Addition of Grove Park as currently submitted. As you are aware, the present stormwater design proposal is based upon hydrological data that is no longer accurate as a result of the dam construction on the eastern boundary of your property.
"We will be happy to review any new stormwater design submitted by a professional engineer which meets both the requirements of the City Code of Ordinances and of the Alabama Court of Civil Appeals. Our staff is available to review this matter with you and your design engineer at your earliest convenience."
Flowers responded by letter on January 16, 2002, stating, in part:
"Please approve the drainage plans for the 2nd addition to Grove Park no later than Monday, January 21, 2001. Failure to do so will result in my taking immediate legal action to remedy this situation."
On January 17, 2002, Flowers informed the City that he had authorized APAC-Alabama, Inc./Couch Construction Division to begin construction on phase II of the Grove Park subdivision and that construction had begun on January 16, 2002. The City notified Flowers on January 24, 2002, that the storm-water management system for the subdivision had not been approved and that the construction must cease immediately. The City notified the contractor on February 5, 2002, that the storm-water management system had not been approved and ordered it to cease work on the subdivision until the storm-water management system was approved.
On February 27, 2002, the Flowers defendants filed a "Motion For Contempt and/or To Show Cause, and/or For Injunctive Relief And Damages" alleging, among other things, that the City had approved the construction plans on December 27, 2001; that in reliance upon the approval of the plans, Flowers had entered into construction contracts; that the construction work had actually begun; that the City had issued a "stop-work order" and had halted the previously approved construction of the subdivision; and that no adequate remedy exists at law to correct the problem. The Flowers defendants sought an order from the trial court setting the matter for a hearing at the earliest possible date to consider the matters alleged and requiring the City to "show cause why the Court should not hold it in contempt for illegally and wrongfully stopping previously approved work" and/or to grant "other equitable relief to rectify and/or remedy the work stoppage and/or enter such orders as are required to allow the resumption of work." On February 28, 2002, the trial court entered an order requiring the City to appear on March 4, 2002, and show cause why the stop-work order on the subdivision should not be lifted. The court set the Flowers defendants' request to hold the City in contempt for a hearing on March 29, 2002. On March 1, 2002, the City moved for clarification of the order to show cause, or, in the alternative, to dismiss, which the trial court denied.
Following an ore tenus proceeding, the trial court, on March 6, 2002, entered an order finding that the City had approved the construction plans submitted by Flowers, including the storm-water management design and that the issuance of the *58 stop-work order was arbitrary, capricious, and an abuse of the City's police power; it also ordered that the stop-work order be set aside and that no further stop-work orders be issued without prior approval from the trial court and awarded Flowers an attorney fee. The trial court denied the City's motion for a stay of execution. The City appeals. This case was transferred to this court by the supreme court, pursuant to § 12-2-7, Ala.Code 1975. The City has not requested a stay of execution from this court.
The relief sought by the Flowers defendants in the trial court was injunctive in nature. Our supreme court has defined an injunction as "`[a] court order commanding or preventing an action.'" Dawkins v. Walker, 794 So.2d 333, 335 (Ala. 2001), quoting Black's Law Dictionary 788 (7th ed.1999). Following a hearing, in which both parties presented evidence, the trial court entered an order directing that the stop-work order be set aside and that no further stop-work orders be issued without the prior approval of the trial court. The trial court's order reaches the merits of the issuance of the stop-work order and has the effect of a permanent injunction. Accordingly, we will treat this appeal as an appeal from the grant of a permanent injunction. See TFT, Inc. v. Warning Sys., Inc., 751 So.2d 1238 (Ala. 1999).
Our supreme court has stated:
"To be entitled to a permanent injunction, a plaintiff must demonstrate success on the merits, a substantial threat of irreparable injury if the injunction is not granted, that the threatened injury to the plaintiff outweighs the harm the injunction may cause the defendant, and that granting the injunction will not disserve the public interest."
Id. at 1242. The review of the issuance of a permanent injunction is de novo. Id.
Gary Martin, the city engineer, testified that the City generally issues a letter for the purpose of clarifying plans that have been stamped as approved. He further testified that the City will issue a partial approval of plans as an accommodation to developers so that construction of certain elements of a development may begin while deficiencies with other elements are being resolved. Martin testified that the City's letter of December 27, 2001, specifically states that "water, street, and sanitary sewer" had been approved. He stated that the storm-water management design for phase II of the subdivision had never been approved by the City because the City had not been supplied with information regarding the impact of the proposed dam on the storm-water management system of the subdivision.
Martin stated that he did not question Flowers's right to build the dam; however, he stated that the impact of the proposed dam on the storm-water management system of the subdivision required additional study. Martin testified that he had not been provided with the design firm's interoffice report of February 18, 2002, containing the analysis of the impact the dam may have on the storm-water management system of the subdivision. However, Martin did state that he had discussed some preliminary information with the firm. Martin stated that characteristics such as the height of the dam and the existence and size of a spillway could have an impact on the existing storm-water management system of the subdivision and that the City has not been supplied with that information.
Parker testified that the height of the dam and the existence and size of a spillway are characteristics that could affect the subdivision, and the City's request for *59 additional storm-water analysis regarding the impact the proposed dam would have on the subdivision was a reasonable one. Parker stated that he and his employer (the design firm hired by Flowers) had nothing to do with the design and construction of the dam. He testified that at the request of the City, his employer performed additional storm-water analysis regarding the effect of the proposed dam on the storm-water management system and that this analysis was based on data supplied by Flowers regarding the size and characteristics of the dam. Parker was unaware whether the report had been provided to the City. Parker stated that he and his employer have not seen any design plans for the dam and he could not state whether the dam was actually built to the specifications Flowers provided to the design firm.
Parker testified that when he received the letter of December 27, 2001, from the City he assumed that the storm-water management design for the subdivision had been approved. However, he stated that when he discussed the letter with Flowers, Flowers pointed out to him that the letter did not mention that the storm-water design had been approved.
Flowers testified that the City approved the storm-water management system for the subdivision by stamping the plans as approved on December 27, 2001. Flowers further stated that a subdivision cannot be partially approved and that construction of the streets cannot be approved without approving the construction of the storm-water management system. However, Flowers also stated that he wrote the January 3, 2002, letter in which he requested specific approval of the storm-water management system, to clarify what elements of the subdivision had been approved for construction. Flowers testified that he did not know whether the design firm considered the effect of the dam on the storm-water management system of the subdivision in the subdivision plans.
After reviewing the record in this case, we conclude that the trial court erred in finding that the City had approved the storm-water management design of the subdivision and in ordering the stop-work order to be set aside. The record indicates that the City stamped the subdivision plans for phase II, which included the storm-water management design, as approved on December 27, 2001. Kramer issued a letter that accompanied the plans indicating that he had reviewed and approved the plans for the subdivision and specifically referred to "water, street, and sanitary sewer" but did not mention the storm-water management system. Flowers responded and recognized that the storm-water management system had not been specifically approved by Kramer and requested that it be promptly approved. The City responded and informed Flowers that it was unable to approve the submitted storm-water management design based on data that was no longer accurate because of the proposed construction of the dam. Flowers himself testified that he did not know whether the design firm considered the effect of the dam on the storm-water management system in preparing the subdivision plans.
The City requested additional storm-water analysis regarding what effect the dam would have on the storm-water management system. Parker testified that this was a reasonable request because such things as the size of the dam and the size and existence of the spillway could affect the storm-water management system of the subdivision. Additional storm-water analysis was completed by the design firm based upon data supplied by Flowers regarding the dam. Parker could not state whether the dam was actually constructed *60 according to the specifications supplied by Flowers and relied upon by the design firm in conducting the additional storm-water analysis. He further stated that he did not know whether the additional analysis was supplied to the City. Martin testified that the City had not been supplied with information concerning what effect the dam would have on the storm-water management system of the subdivision and that the storm-water management design had not been approved.
Because we are reversing the judgment, we pretermit discussion of the other issues raised by the City. Accordingly, the trial court's judgment is reversed and the case is remanded for entry of an order consistent with this opinion.
REVERSED AND REMANDED.
CRAWLEY, THOMPSON, PITTMAN, and MURDOCK, JJ., concur.

On Application for Rehearing
YATES, Presiding Judge.
APPLICATION OVERRULED.
CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
MURDOCK, J., concurs specially.
MURDOCK, Judge, concurring specially.
On rehearing, the Flowers defendants argue that, on original submission, this court incorrectly relied on TFT, Inc. v. Warning Systems, Inc., 751 So.2d 1238 (Ala.1999), and therefore incorrectly applied a de novo standard of review. The decisions of both the trial court and the Alabama Supreme Court in TFT turned on an objective review of certain documents and the application of governing law to those documents. It does not appear from the Supreme Court's opinion in TFT, Inc., that ore tenus evidence was material (1) to the court's interpretation of the documents or (2) to the court's consideration of whether the threatened injury to the plaintiff outweighed the harm that the requested injunction may cause the defendant or whether granting the injunction would disserve the public interest. See generally Clark Constr. Co. v. Pena, 930 F.Supp. 1470 (M.D.Ala.1996) (outlining elements required for injunctive relief). Citing Smith v. Madison County Commission, 658 So.2d 422, 423 n. 1 (Ala.1995), the Supreme Court in TFT, Inc., therefore applied a de novo standard of review. Id.
At issue in Smith was a pure question of law. As the Supreme Court noted, the appeal presented "a single issue: Whether the Madison County Commission's statutory authority to enforce its building code ended through application of Alabama's `Sunset Act.'" 658 So.2d at 423 (footnote omitted). Where the sole issue presented is a question of law, an appellate court's review is, indeed, de novo. See, e.g., Thompson Tractor Co. v. Fair Contracting Co., 757 So.2d 396 (Ala.2000); Patrick Home Ctr., Inc. v. Karr, 730 So.2d 1171 (Ala.1999); Friday v. Ethanol Corp., 539 So.2d 208 (Ala.1988).
The outcome in the present case, however, does not appear to turn merely upon a review of documents or the application of governing law to those documents. As the Flowers defendants note, decisions of both the Alabama Supreme Court and this court, before and after Smith, reaffirm the principle that, where a trial court's decision to grant or to deny a permanent injunction turns on evidence received ore tenus, an appellate court does not review that trial court's decision de novo. In support of this proposition, the Flowers defendants cite to this court the cases of Carson v. City of Prichard, 709 So.2d 1199, 1207 (Ala.1998) ("It is settled law that whether to grant or to deny injunctive *61 relief rests in the sound discretion of the trial court and that the trial court's ruling on that question will not be set aside unless that court has abused its discretion." (citing Acker v. Protective Life Insurance Co., 353 So.2d 1150 (Ala.1977) (affirming a trial court's denial of a permanent injunction))); Lott v. City of Daphne, 624 So.2d 544, 545 (Ala.1993) (affirming a trial court's denial of a permanent injunction and holding that "[t]o establish an abuse of discretion in the trial court's denying or granting injunctive relief, it must be shown that the trial court committed a clear or palpable error"); Lange v. Scofield, 567 So.2d 1299, 1301 (Ala.1990) ("[A] presumption of correctness attends determinations made by trial courts sitting without a jury and hearing evidence presented ore tenus. This court will not disturb the decisions of such courts unless their findings are plainly and palpably wrong or manifestly unjust."); Lisenby v. Simms, 688 So.2d 864 (Ala.Civ.App.1997); Romano v. Caribe, U.S.A., Inc., 702 So.2d 1230 (Ala.Civ.App. 1996) (affirming the application of a deferential standard of appellate review as to the issuance of a permanent injunction), rev'd on other grounds, 702 So.2d 1234 (Ala.1997). I also note the holding of our Supreme Court in Nunley v. State, 628 So.2d 619 (Ala.1993):
"The permanent injunction was based upon [the] clear determination that [the defendants] were violating the [Deceptive Trade Practices] Act. Under the ore tenus standard of review, this determination bears a presumption of correctness and it will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence."
628 So.2d at 622.
Thus, I acknowledge the merit of the Flowers defendants' argument as to the proper standard of review in this case. Nonetheless, even under the more deferential standard required by the above-cited authority, I conclude that the record (taking into consideration both the documentary evidence and the evidence received ore tenus) supports a reversal of the trial court's judgment in this case. Accordingly, I concur in overruling the application for rehearing because I continue to agree with the result reached in the majority opinion.