BOLIN, Justice.
Capmark Bank appeals from a preliminary injunction entered in favor of RGR, LLC; MB Park, LLC; TTM MB Park, LLC; Robert G. Randall; and T. Todd *1260 Martin III (hereinafter referred to collectively as “RGR”) enjoining Capmark from foreclosing on certain real property serving as the primary collateral for a loan from Capmark to RGR, LLC, MB Park, LLC, and TTM MB Park, LLC (hereinafter referred to collectively as “the limited liability companies”). We reverse and remand.

Facts and Procedural History

A. The Loan

On September 27, 2007, Capmark and the limited liability companies executed a loan agreement pursuant to which Cap-mark agreed to loan the limited liability companies the original principal amount of $12,822,500. The limited liability companies used the loan proceeds to acquire and to rehabilitate two apartment complexes in Mobile County. The loan was evidenced by two promissory notes executed by the limited liability companies: promissory note A in favor of Capmark in the principal amount of $6,332,500, and promissory note B in the principal amount of $5,990,000. The limited liability companies were to repay the amounts set forth in the promissory notes in accordance with the terms of the loan agreement. As security for the loan, the limited liability companies executed a “Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing” in favor of Capmark. Pursuant to the mortgage and assignment, the apartment complexes served as collateral for the limited liability companies’ obligations under the loan agreement. Additionally, the limited liability companies also granted Capmark an assignment of all rents and leases related to the properties and gave Capmark a first-priority security interest in all the limited liability companies’ fixtures, goods, equipment, accounts, and general intangibles.
Simultaneous with the execution of the other loan documents, and as further security for the loan, Robert G. Randall and T. Todd Martin III, the owners of the limited liability companies,[1] executed three separate guaranty agreements in favor of Cap-mark: (1) the full-payment and performance guaranty pursuant to which Randall and Martin irrevocably and unconditionally guaranteed the prompt payment to Cap-mark when due of all obligations and liabilities under the loan agreement and other loan documents; (2) the completion and lien-free performance guaranty pursuant to which Randall irrevocably and unconditionally guaranteed the full and timely completion of all construction work in accordance with the terms of the loan agreement free of any liens and the full and timely payment of all contractors and material suppliers; and (3) the exception to nonrecourse liability guaranty pursuant to which Randall and Martin irrevocably and unconditionally guaranteed the prompt payment to Capmark when due of all obligations and liabilities for which Randall and Martin become personably liable under Article 12 of the loan agreement and the other loan documents.
Martin testified in his affidavit that shortly before closing on the loan, Cap-mark required the limited liability companies to increase their equity contribution by $540,000 and unilaterally reduced the amount of the loan by $300,000.[2] Martin stated that Capmark’s requirement that the limited liability companies increase *1261 their equity contribution and the unilateral reduction of the loan amount came just as their purchase option for the apartments was about to expire, leaving the limited liability companies with little time to seek other arrangements. Martin testified that the limited liability companies specifically informed Capmark that reducing the loan amount while also requiring an increase in its equity contribution would likely result in cash-flow shortages early in the project. Martin stated that Capmark assured the limited liability companies that funds would be available as a contingency if needed to address any cash-flow shortages. He stated that Capmark acknowledged in writing that it had agreed to provide $300,000 in cash-flow funding and that the limited liability companies closed the loan based on that representation. Martin and Randall contributed $1,540,000 of their own money at the closing of the loan and have since invested an additional $750,000 in the project.

B. The Loan Agreement

Pursuant to Section 2.01(a) of the loan agreement, Capmark agreed to loan the limited liability companies the “Maximum Loan Amount.” Section 19.01 of the loan agreement defines the “Maximum Loan Amount” as the “maximum principal amount of $12,322,500.” Pursuant to section 2.03(c) of the loan agreement, the loan matured on October 1, 2010. Section 2.06 provides that Capmark had no obligation to refinance the loan.
Section 2.04(a) of the loan agreement governs the payment terms of the loan; it provides, in part, that “all amounts due under this Loan Agreement and the other Loan Documents shall be paid without set-off, counterclaim, or any other deduction whatsoever.” Article 11 of the loan agreement governs the event of default and Capmark’s remedies upon an occurrence of a default. Section 11.01 provides, in part:
“The occurrence of any one or more of the following events, shall at Lender’s option, constitute an ‘Event of Default’ hereunder:
“(a) If any payment of principal and interest (or interest if the Loan is interest-only) is not paid in full on or before the Payment Due Date on which such payment is due;
[[Image here]]
“(c) If unpaid principal, accrued but unpaid interest and all other amounts outstanding under the Loan Documents are not paid in full on or before the Maturity Date;
[[Image here]]
“(i) If any Guarantor repudiates or revokes the Guaranty or Environmental Indemnity;
[[Image here]]
“(t) If the Mandatory Performance Test Paydown is not paid in full when required in accordance with Section 2.05(f) of this Loan Agreement.”
Section 11.02 of the loan agreement provides that, in the event of a default, Cap-mark may accelerate the loan by declaring the entire unpaid principal balance of the loan to be immediately due and payable, may institute foreclosure proceedings against the properties, and may apply for the appointment of a receiver, trustee, liquidator, or conservator of the properties.
Section 18.02 of the loan agreement contains a merger and integration clause, which provides as follows:
“Entire Agreement; Modifications; Time of Essence. This Loan Agreement, together with the other Loan Documents, eontain[s] the entire agreement between Borrower and Lender relating to the Loan and supersede^] and replaced] all prior discussions, representations, communications and agreements (oral or written). If the terms of any of *1262 the Loan Documents are in conflict, this Loan Agreement shall control over all of the other Loan Documents unless otherwise expressly provided in such other Loan Document. No Loan Document shall be modified, supplemented or terminated, nor any provision thereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing. Time is of the essence with respect to all of the Borrower’s obligations under the Loan Documents.”
Martin testified that the loan agreement contemplated that Capmark would convert the construction financing to permanent financing once the project was complete. Martin testified that a Capmark representative informed the limited liability companies that “the benefit to doing this deal with us is that ... while the rate is a bit higher ... you’re only going to have one underwriting expense. One and done.... ” Martin explains that the point of the statement is that the limited liability companies would incur just one underwriting expense — at the time the initial construction loan was made — but that there would be no further underwriting costs because Capmark would be the bank providing the permanent financing.

C. Alleged Defaults and Breaches of the Loan Agreement

1. The Cash-Flow Fund

Martin testified that the limited liability companies purchased the apartment complexes and completed the rehabilitation of the complexes on December 1, 2008, on schedule and under budget. The limited liability companies then began the process of repopulating the apartments. Martin testified that as the apartments were being rehabilitated, the global financial markets crashed, which resulted in unprecedented setbacks in the local rental market. The crash of the financial markets, combined with high unemployment rates, adversely impacted the limited liability companies’ ability to lease the apartments, which, in turn, negatively impacted their cash flow. Martin testified that notwithstanding these difficult circumstances near full occupancy was achieved in both apartment complexes, although certain rent concessions had to be made. The limited liability companies also made additional investments in the project in order to enhance the marketability of the apartments.
Martin testified that in the midst of the economic downturn and the limited liability companies’ cash-flow problems, Capmark refused the limited liability companies’ request to access the $300,000 cash-flow funding. Martin states that Capmark’s refusal occurred at a time when the limited liability companies were in full compliance with their obligations under the loan agreement. Martin contends that Cap-mark’s failure to provide the cash-flow funding as promised adversely affected the limited liability companies’ subsequent ability to perform under the loan agreement.

2. Permanent Financing

In September 2009, the limited liability companies received a letter from Capmark advising them that the notes would mature on October 1, 2010. The letter informed the limited liability companies that they were being notified 12 months in advance of the maturity date so that refinancing arrangements may be made before the maturity date of the loan. Martin testified that the letter seemed to suggest that the limited liability companies should seek permanent financing elsewhere. Martin stated that the limited liability companies became concerned that Capmark may not honor its promise to provide permanent financing. Randall contacted Nick Liska, *1263 a Capmark representative, and specifically addressed the letter and the issue of permanent financing. Liska responded that the letter was a standard 12-month notice that is sent out before the maturity date for all loans serviced by Capmark and does not state that “Capmark will not continue with the loan agreement.” Capmark never provided the limited liability companies with permanent financing.

S. The Performance Test

On December 22, 2009, the limited liability companies received a letter from Cap-mark stating that they were in default of the loan agreement for failing to satisfy a financial-performance test.[3] Martin stated that the performance test was based on a “complete fiction” because, he says, the interest rate applied by Capmark had no relevancy to the then current markets. Martin testified that the interest rate applied by Capmark for the performance test was an artificially high 8% when the then current interest rate was closer to 3%. Martin stated that Capmark essentially invented a default and then demanded, pursuant to the pay-down clause in the loan agreement, that the limited liability companies reduce the principal balance of the loan by $2,237,487.11. The limited liability companies protested and, according to Martin, Capmark initially represented that the demand letter was merely a formality and that a loan modification could be “worked out.” On March 9, 2010, Cap-mark and the limited liability companies entered into a prenegotiation agreement pursuant to which the parties agreed to participate in good-faith discussions concerning the status of the loan and a possible modification or other resolution. The agreement provided that either party had the right to terminate the “work-out” discussions upon written notice to the other party specifying the effective date of the termination of the discussions.
"Mandatory Performance Test Paydown. On each Performance Test Date the Property shall be required to meet the following performance tests (each, as applicable, a ‘Performance Test ’): the Debt Service Coverage Constant Ratio on a trailing three (3) month basis shall be no less than (i) 1.00:1.00 on the first (1st) Performance Test Date, (ii) 1.07:1.00 on the second (2nd) Performance Test Date, and (iii) 1.15:1.00 on the third (3rd) Performance Test Date. In the event the Property does not meet the Performance Test for the applicable Performance Test Date, Borrower shall, within ten (10) days of written demand therefor, pay to Lender the amount, as reasonably determined by Lender, which is necessary to be applied to the outstanding principal balance of the Loan in order for the Property to meet the immediately preceding Performance Test (such amount, a 'Mandatory Performance Test Paydown '), together with the Exit Fee due upon the prepayment made with such Mandatory Performance Test Paydown. Failure by Borrower to deliver the Mandatory Performance Test Pay-down within ten (10) days of written demand therefor shall be an Event of Default hereunder.”
However, RGR states that the Capmark representative with whom they had been working was replaced and that the negotiations then went in a different direction. In May 2010, the limited liability companies received a “Notice of Default — Demand for Payment” from Capmark stating that “events of Default” had occurred, including the failure to make all payments due in April 2010 and May 2010 and the failure to pay the $2,237,487.11 performance test pay down of principal. Also in May 2010, Capmark began charging the limited liability companies default interest. On June 16, 2010, Capmark accelerated the loan by declaring the entire unpaid principal balance with all accrued and unpaid interest and charges immediately due.
*1264 Capmark contends that the limited liability companies are in default of section 11.01(t) of the loan agreement for failing to make the mandatory pay down of principal on the loan. Capmark further alleges that the limited liability companies ceased making the monthly debt-service payments on the loan in April 2010, which constitutes a default under section 11.01(a) of the loan agreement. Additionally, Capmark alleges that the loan matured on October 1, 2010, and that the limited liability companies did not repay the loan at that time, which constitutes a default of the loan agreement under section 11.01(c)
A The Guaranty
Martin testified that at about the same time Capmark started charging default interest and accelerated the loan, it also asserted the existence of the full-payment and performance guaranty discussed above in Part A of this opinion. Martin stated that much like the performance test, Capmark’s assertion of the unconditional guaranty was a manufactured pretext to compel RGR to acquiesce in Cap-mark’s demands. Martin stated that the loan was a true nonrecourse loan and that he and Randall “were never asked to, never agreed to, and did not unconditionally” guaranty the loan. Martin claims that the signature page of the full-payment and performance guaranty does not match the rest of the document because the document is identified as HOU:2720221A and the signature page is identified as HOU:2720221ü. Martin further supports his contention with the affidavit of Chad Hagood, Capmark’s loan officer for the loan during the application negotiations with the limited liability companies. Ha-good testified as follows:
“The Loan in this case was offered to the Borrowers as Capmark non-recourse interim loan structure. I assisted in preparing, and signed, with approval from Capmark’s New York office, the Loan application.... The non-recourse paragraph on page 3 of the Loan application reflects the general non-recourse structure and the ‘carve-out’ conditions of the non-recourse provisions for the Capmark loan.
“I never asked Mr. Martin or Mr. Randall to provide an unconditional guaranty of the Loan. Moreover, no one from Capmark, including the Capmark credit committee, ever asked me to even discuss with Mr. Martin or Mr. Randall the possibility of unconditionally guarantying the Loan. Furthermore, if an unconditional guarantee was a condition to the Loan’s final approval, I was specifically not informed of this material change and have no knowledge of any discussions internally at Capmark relating to the change in question. In fact, to the best of my knowledge and belief, the non-recourse structure, without unconditional personal guarantees (with the exception of the standard ‘carve-out’ matters), was specifically offered, structured, and priced in the interest rate for this Loan.
[[Image here]]
“As I was not involved in the preparation, review, negotiations or execution of the loan documents, I have no knowledge regarding whether, or how, a signature for Mr. Martin or Mr. Randall would be found on a Full Payment and Performance Guaranty. Such a guaranty would not be consistent with the transaction that Capmark’s underwriting group presented to me and I, in turn, presented to Messrs. Martin and Randall.”
Capmark also contends that Martin and Randall’s repudiation of the full-payment guaranty constitutes a default pursuant to section 11.01(i) of the loan agreement.
*1265 On June 25, 2010, Capmark sued RGR alleging that the limited liability companies were in default of the loan agreement and sought the appointment of a receiver for the apartment complexes that served as collateral for the loan. Additionally, Cap-mark sought certain injunctive relief and asserted breach-of-contract claims against RGR, for which it sought the amounts allegedly due under the loan agreement.
On July 13, 2010, RGR answered Cap-mark’s complaint, generally denying Cap-mark’s allegations, and asserted certain affirmative defenses. RGR also counterclaimed against Capmark alleging that Capmark had fraudulently “obtained or otherwise created” the full payment and performance guaranty and had fraudulently represented that $300,000 in cash-flow funding would be provided. RGR sought to have all the loan documents rescinded based on the alleged fraud and any other equitable relief the trial court deemed just. RGR also alleged that Capmark had breached the agreement to provide the $300,000 in cash-flow funding and had breached the prenegotiation “work-out” agreement. On September 13, 2010, Cap-mark answered RGR’s counterclaim and asserted certain affirmative defenses.
On October 27, 2010, the trial court ordered the parties to participate in mediation, which was unsuccessful. On November 15, 2010, Capmark notified RGR that it had noticed the properties for a nonjudicial foreclosure sale on December 8, 2010. On December 1, 2010, RGR moved the trial court to prevent the scheduled foreclosure and/or for a preliminary injunction, arguing that Capmark had unclean hands that prevented it from seeking the equitable remedy of foreclosure and that RGR was entitled to injunctive relief because, it said, it would suffer an irreparable injury if the properties were foreclosed on; that it had a reasonable likelihood of success on the merits of its breach-of-contract claim;[4] and that the hardship imposed upon it by the foreclosure would unreasonably outweigh any hardship to Capmark caused by granting the injunctive relief. RGR also argued that it was entitled to certain equitable relief, including the reformation of the loan documents.
On December 2, 2010, Capmark responded to RGR’s motion to prevent foreclosure and/or for a preliminary injunction, arguing that RGR had not satisfied the requirements entitling it to a preliminary injunction. On December 2, 2010, RGR filed a supplement in support of its motion to prevent foreclosure and/or for a preliminary injunction, arguing that Capmark’s failure to perform its own obligations entitled RGR to enjoin the foreclosure. On December 7, 2010, the trial court entered an order granting RGR’s motion for a preliminary injunction, stating:
“This Court, having considered [RGR’s] Motion to Prevent Foreclosure Scheduled for December 8, 2010, and/or for Preliminary Injunction, along with the pleadings, supporting arguments, exhibits, and related documents, makes the following preliminary findings:
“1. Without an injunction preserving the status quo with regard to said foreclosure, [RGR] will suffer immediate and irreparable injury, including, but not limited to, damage to [its] ongoing business, damage to [its] reputation, damage to [its] relationship with [its] tenants, and loss of [its] equity in the Project.
*1266 “2. The injunction is necessary because, in light of the foregoing items of damage, [RGR has] no adequate remedy at law.
“3. [RGR has] demonstrated a reasonable likelihood of success on the merits of this case, including, without limitation, (i) proving that Capmark breached its agreement to fund a $300,000 cash flow fund; (ii) proving that Capmark breached its agreement to provide permanent financing; and (iii) proving that Capmark engaged in inequitable conduct such that it has unclean hands and is prevented from relying on equitable remedies.
“4. The hardship suffered by [RGR], should the injunction not issue, will be much greater than any hardship experienced by Capmark if the request for injunctive relief is in fact granted. Indeed, this Court has previously determined that the Project is being properly preserved, well managed, and is not being subjected to any waste.”
The trial court also ordered that RGR post a $30,000 bond; ordered that all funds being held in the trust account of RGR’s counsel be deposited with the clerk of the trial court; and ordered that all monthly rent revenues from the apartments be deposited with the clerk of the court. Cap-mark appeals.[5]

Standard of Review

In Holiday Isle, LLC v. Adkins, 12 So.3d 1173 (Ala.2008), this Court set forth the standard for reviewing an order issuing a preliminary injunction:
“We have often stated: ‘The decision to grant or to deny a preliminary injunction is within the trial court’s sound discretion. In reviewing an order grant-
ing a preliminary injunction, the Court determines whether the trial court exceeded that discretion.’ SouthTrust Bank of Alabama, N.A. v. Webb-Stiles Co., 931 So.2d 706, 709 (Ala.2005).
[[Image here]]
“To the extent that the trial court’s issuance of a preliminary injunction is grounded only in questions of law based on undisputed facts, our longstanding rule that we review an injunction solely to determine whether the trial court exceeded its discretion should not apply. We find the rule applied by the United State Supreme Court in similar situations to be persuasive: ‘We review the District Court’s legal rulings de novo and its ultimate decision to issue the preliminary injunction for abuse of discretion.’ Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006); see also Justice Murdock’s special writing while sitting as a judge on the Court of Civil Appeals in City of Dothan v. Eighty-Four West, Inc., 871 So.2d 54, 60 (Ala.Civ.App.2003) (Murdock, J., concurring specially on application for rehearing) (cited with approval in McGlathery v. Richardson, 944 So.2d 968, 970 (Ala.Civ.App.2006)).”
12 So.3d at 1175-76.

Discussion

Capmark argues, among other things, that the trial court exceeded its discretion in granting RGR a preliminary injunction because, it says, RGR failed to establish the necessary elements required to support an injunction. A preliminary injunction should be issued only when the party seeking an injunction has established
*1267 “ ‘ “(1) that without the injunction the [party] would suffer irreparable injury; (2) that the [party] has no adequate remedy at law; (3) that the [party] has at least a reasonable chance of success on the ultimate merits of his case; and (4) that the hardship imposed on the [party opposing the preliminary injunction] by the injunction would not unreasonably outweigh the benefit accruing to the [party seeking the injunction].” ’
“Ormco Corp. v. Johns, 869 So.2d 1109, 1113 (Ala.2003) (quoting Perley v. Tapscan, Inc., 646 So.2d 585, 587 (Ala.1994)).”
Adkins, 12 So.3d at 1176. The party seeking the preliminary injunction bears the burden of producing evidence sufficient to support its issuance. Ormco Corp. v. Johns, 869 So.2d 1109, 1113 (Ala.2003). “If the party seeking the injunction fails to establish each of these prerequisites, then a preliminary injunction should not be entered. If the trial court enters a preliminary injunction when these prerequisites have not been met, the trial court’s order must be dissolved and the case remanded.” Blount Recycling, LLC v. City of Cullman, 884 So.2d 850, 853 (Ala.2003).

A. Likelihood of Success on the Merits

Breach-of-Contract Claims

Capmark argues on appeal that the trial court erred in finding that RGR demonstrated a reasonable likelihood of success on the merits of its breach-of-contract claims alleging that Capmark “breached its agreement to fund a $300,000 cash flow fund” and “breached its agreement to provide permanent financing.”[6] In order to recover on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiffs performance under the contract; (3) the defendant’s nonperformance; and (4) damages. Reynolds Metals Co. v. Hill, 825 So.2d 100, 105 (Ala.2002). Capmark argues that RGR cannot establish the existence of a valid agreement obligating Cap-mark to provide cash-flow funding of *1268 $800,000 and to provide permanent financing.

1. Alleged Cash-Flow-Funding Breach

RGR alleged in its counterclaim that “the loan papers contemplated an additional $300,000 of funding”; that Cap-mark “promised at and after closing to make $800,000 available to Borrowers if cash flow shortages arose as contemplated in the loan documents ”; and that when Capmark was asked to honor this promise it refused to do so. RGR argued in its motion for a preliminary injunction that the “loan papers contemplated an additional $300,000 of funding”; that Capmark promised the limited liability companies that the money would be available to them in the future if it was necessary to fund their cash-flow needs; and that Capmark ignored their request to provide the cash-flow funding.
Despite RGR’s assertions, it has failed to direct this Court to any provision in the loan documents to support its allegations. Indeed, nothing in a reading of the express terms of the loan documents can be construed as obligating Capmark to provide the limited liability companies an additional $300,000 in cash-flow funding. Pursuant to sections 19.01 and 2.01(a) of the loan agreement, Capmark agreed to lend the limited liability companies the maximum principal loan amount of $12,322,500. Any allegation by RGR that the loan documents obligated Capmark to lend funds beyond this amount is contradicted by the plain language of the loan documents. Accordingly, to the extent that RGR relies on the loan documents, RGR cannot establish the existence of a valid agreement obligating Capmark to provide $300,000 in cash-flow funding.
However, contrary to its position taken in earlier pleadings that the loan papers contemplated Capmark’s providing RGR an additional $300,000 in cash-flow funding, RGR argues in its appellate brief that Capmark’s agreement to provide the limited liability companies the $300,000 in cash-flow funding was a “separate but contemporaneous” agreement. We disagree and find that there is no “separate but contemporaneous” agreement obligating Capmark to provide an additional $300,000 in cash-flow funding to the limited liability companies.
We initially note that other than the amount to be loaned, RGR has offered nothing in the way of the essential terms of the agreement, including but not limited to the interest rate to be charged, the term of the loan, and any restrictions placed on the loan.
“[A]ny contract must express all terms essential to the transaction with definiteness sufficient to enable a court to enforce the parties’ agreement. White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1051 (Ala.2008). ‘“[A] contract that ‘ “leav[es] material portions open for future agreement is nugatory and void for indefiniteness.” ’ ” ’ Id. (quoting Miller v. Rose,, 138 N.C.App. 582, 587-88, 532 S.E.2d 228, 232 (2000), quoting in turn MCB Ltd. v. McGowan, 86 N.C.App. 607, 609, 359 S.E.2d 50, 51 (1987)).”
Macon Cnty. Greyhound Park, Inc. v. Knowles, 39 So.3d 100, 108 (Ala.2009). Because the alleged agreement to provide $300,000 in cash-flow funding is silent as to its essential terms, it is unenforceable.
Further, section 18.02 of the loan agreement contains a merger and integration clause, which provides:
“Entire Agreement; Modifications; Time of Essence. This Loan Agreement, together with the other Loan Documents, contain[s] the entire agreement between Borrower and Lender relating *1269 to the Loan and supersede^] and re-placets] all prior discussions, representations, communications and agreements (oral or written). If the terms of any of the Loan Documents are in conflict, this Loan Agreement shall control over all of the other Loan Documents unless otherwise expressly provided in such other Loan Document. No Loan Document shall be modified, supplemented or terminated, nor any provision thereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing. Time is of the essence with respect to all of the Borrower’s obligations under the Loan Documents.”
(Emphasis added.) This Court has stated the following with regard to merger clauses:
“A merger clause creates ‘a presumption that the writing represents an integrated, that is, the final and complete, agreement of the parties.’ Ex parte Palm Harbor Homes, Inc., 798 So.2d 656, 660 (Ala.2001). A merger clause invokes the parol evidence rule, which precludes a court from considering extrinsic evidence of prior or contemporaneous agreements in order to ‘change, alter, or contradict’ the terms of the integrated contract. Palm Harbor Homes, 798 So.2d at 660.
“A merger clause, however, does not bar evidence of contemporaneous collateral agreements between the parties. See Alabama Elec. Coop., Inc. v. Bailey’s Constr. Co., 950 So.2d 280, 288 (Ala.2006) (‘ “ ‘It is only when the instrument shows that it does not contain all the terms of the contract as to both parties to it that evidence may be offered to show further stipulation than those expressed, unless it is proposed to prove an engagement independent of and collateral to the matters embraced in such written instrument.’ ” ’ (quoting Hartford Fire Ins. Co. v. Shapiro, 270 Ala. 149, 153, 117 So.2d 348, 352 (1960), quoting in turn Woodall v. Malone-Harrison Motor Co., 219 Ala. 366, 368, 122 So. 357, 358 (1929) (emphasis added in Shapiro))); and Southern Guar. Ins. Co. v. Rhodes, 46 Ala.App. 454, 459, 243 So.2d 717, 721 (1971) (‘This [merger-clause] principle does not prohibit negotiation of more than one agreement at the same time.... If such agreements are clearly collateral, separate and distinct as to subject matter there is no problem presented. They are two separate contracts and are to be considered as such.’).”
Ritter v. Grady Auto. Group, Inc., 973 So.2d 1058, 1062 (Ala.2007). In Ritter, this Court discussed the three-pronged test for determining whether alleged contemporaneous agreements were truly collateral and therefore outside the scope of a merger clause:
“In Hartford Fire [Insurance Co. v. Shapiro, 270 Ala. 149, 117 So.2d 348 (1960) ], this Court quoted various tests used by other courts to determine whether an agreement is collateral and therefore outside the scope of a merger clause. The Court quoted Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646 (1928), a ‘leading case,’ which gave three requirements for an agreement to be beyond the scope of a merger clause: ‘ “(1) The agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing.” ’ Hartford Fire, 270 Ala. at 154, 117 So.2d at 353 (quoting Mitchill v. Lath, 247 N.Y. at 381, 160 N.E. at 647). The Court also quoted Professor Wigmore, IX Wigmore, Evidence § 2430, 98 (3d ed.): *1270 ‘ “This intent [to form a collateral agreement] must be sought where always intent must be sought ..., namely, in the conduct and language of the parties and the surrounding circumstances.” ’ 270 Ala. at 154, 117 So.2d at 853. In Southern Guaranty [Insurance Co. v. Rhodes, 46 Ala.App. 454, 243 So.2d 717 (1971) ], the Court of Civil Appeals looked to the ‘conduct and language of the parties, the surrounding circumstances and the written instrument’ in order to determine ‘whether it was the intent of the parties that the written instrument embody all of the prior negotiations ... or whether ... it was intended there be an additional, collateral and separate oral agreement.’ 46 Ala.App. at 459, 243 So.2d at 721. That court also looked to the Mit-chill test to evaluate the collateral nature of the agreements.
“We held in Alabama Electric Cooperative[, Inc. v. Bailey’s Construction Co., 950 So.2d 280 (Ala.2006),] that an oral agreement to insure was not collateral to an insurance policy, ‘[i]n light of the fact that the written contract dealt expressly with the subject matter of the alleged collateral oral agreement.’ 950 So.2d at 289. The oral agreement ‘was one the parties would naturally have included in the written agreement.’ 950 So.2d at 289. Similarly, we held in Hartford Fire that an oral agreement to insure was not collateral to an insurance policy because it was ‘closely bound to the written one, and no doubt intended to be made part and parcel thereto.’ 270 Ala. at 155, 117 So.2d at 354. The Court of Civil Appeals held in Southern Guaranty that the oral agreement to insure met none of the three factors of the Mitchill test and, therefore, was not a collateral agreement.”
973 So.2d at 1062-63.
In this case, the alleged agreement obligating Capmark to provide the limited liability companies an additional $300,000 in cash-flow funding fails to satisfy the Mitchill v. Lath, 247 N.Y. 377, 160 N.E. 646 (1928), test. First, the alleged agreement is not “collateral in form” because it deals with the identical subject matter as that of the loan agreement and other loan documents, that being the financing of the limited liability companies’ purchase and rehabilitation of the apartment complexes. See Alabama Elec. Coop., Inc. v. Bailey’s Constr. Co., 950 So.2d 280, 289 (Ala.2006) (holding that an oral agreement to insure was not collateral to an insurance policy “[i]n light of the fact that the written contract dealt expressly with the subject matter of the alleged collateral oral agreement”). Second, the alleged agreement to provide $300,000 in cash-flow funding contradicts the express and implied provisions of the loan documents. In sections 19.01 and 2.01(a) of the loan agreement, Cap-mark agreed to loan the limited liability companies only the maximum principal loan amount of $12,322,500. Thus, an alleged promise to loan additional funds to the limited liability companies over and above the maximum loan amount of $12,322,500 directly contradicts the express provisions of the loan documents. Finally, the alleged agreement to provide $300,000 for a cash-flow fund is an agreement the parties would “ordinarily be expected to embody in the writing.” Section 8—9—2(7), Ala.Code 1975, requires that “[e]very agreement or commitment to lend money, delay or forbear repayment thereof ... except for consumer loans with a principal amount financed less than $25,000” must be in writing or the agreement is void.[7] Every aspect of the parties’ agree *1271 ment is embodied in the numerous loan documents, including the loan agreement, which alone exceeds 70 pages. Considering the requirement in § 8-9-2(7) that agreements to lend money in excess of $25,000 be evidenced by a writing, the fact that the parties had evidenced every other aspect of their agreement in writing, and the closely related nature of the loan documents and the alleged agreement to provide cash-flow funding, the alleged agreement obligating Capmark to provide $300,000 in cash-flow funding is one the parties would “ordinarily be expected to embody in the writing.” Ritter, 973 So.2d at 1062.
Because the alleged agreement obligating Capmark to provide cash-flow funding cannot be considered a collateral agreement, the merger clause contained in the loan agreement would serve to invalidate said agreement. Accordingly, RGR cannot establish the existence of a separate contemporaneous agreement obligating Cap-mark to provide it with $300,000 in cash-flow funding.

2. Alleged Permanent-Financing Breach

RGR argues that Capmark promised during loan negotiations that it would at the appropriate time convert the construction financing to permanent financing. Martin testified that a Capmark representative informed the limited liability companies that “the benefit to doing this deal with us is that ... while the rate is a bit higher ... you’re only going to have one underwriting expense. One and done....” Martin explains that the point of the statement is that the limited liability companies would incur just one underwriting expense — at the time the initial construction loan was made — and that there would be no further underwriting costs because Capmark would be the bank providing the permanent financing. In September 2009, the limited liability companies received a letter from Capmark advising them that the note would mature on October 1, 2010. Martin testified that the letter seemed to suggest that the limited liability companies should seek permanent financing elsewhere and that the limited liability companies became concerned that Capmark may not honor its promise to provide permanent financing. The limited liability companies contacted a Capmark representative regarding the letter and were told that the letter was a standard 12-month notice sent out before the maturity date for all loans serviced by Cap-mark and does not state that “Capmark will not continue with the loan agreement.”
RGR’s claim that Capmark agreed to provide permanent financing directly contradicts the express terms of the loan agreement. Section 2.06 of the loan agreement provides, in part, as follows: “No Exit Fee shall be due, however, if Borrower refinances this Loan with the proceeds of a loan funded for Borrower by Capmark Finance Inc. or Capmark Bank. Borrower acknowledges that neither Capmark Finance Inc. nor Capmark Bank has any obligation to make such a loan.” RGR has offered nothing to the contrary. Further, any alleged promise made by Cap-mark during the loan negotiations would have been superseded and invalidated by the merger and integration clause in the loan agreement. Thus, we conclude that RGR cannot prove the existence of a valid and binding agreement obligating Cap- *1272 mark to provide the limited liability companies permanent financing.
Because RGR has failed to establish the existence of a valid and binding contract obligating Capmark to provide it with $300,000 in cash-flow funding and with permanent financing, it cannot demonstrate a reasonable likelihood of success on the merits of its breach-of-contract claims. Accordingly, we conclude that the trial court’s finding that RGR had demonstrated a reasonable likelihood of success on the merits of its underlying breach-of-contract claims is not supported by the evidence,[8] and we hold that the trial court exceeded its discretion in issuing the preliminary injunction. Having determined that RGR has failed to establish a reasonable likelihood of success on the merits of its breach-of-contract claims, it is unnecessary for this Court to determine whether RGR has proven the remaining elements necessary to entitle it to a preliminary injunction. Therefore, we pretermit any discussion of those issues.

B. Unclean Hands

RGR alleged and the trial court found that RGR had demonstrated a reasonable likelihood of success on the merits of its claim that Capmark had engaged in inequitable conduct such that it has unclean hands preventing it from relying on the equitable remedy of foreclosure. RGR also based this argument on its claims that Capmark had breached the agreements to provide an additional $300,000 in cash-flow funding and to provide permanent financing addressed above. This Court, having found that RGR failed to demonstrate the existence of valid binding agreements obligating Capmark to provide the cash-flow funding and the permanent financing, must also conclude that RGR cannot establish that Capmark had “unclean hands” based on the alleged breach of those nonexistent agreements such as to deny it the equitable remedy of foreclosure. Accordingly, we reverse the trial court’s related holding that RGR had demonstrated a reasonable likelihood of success on the merits of its unclean-hands argument.

Conclusion

Based on the foregoing, we conclude that RGR has failed to establish the requisite elements entitling it to a preliminary injunction, and we reverse the trial court’s judgment issuing the injunction. We also conclude that RGR failed to establish that Capmark had “unclean hands” so as to prohibit it from seeking the equitable remedy of foreclosure, and we reverse the trial court’s finding as to that claim. Because we reverse the trial court on the above-mentioned grounds, it is unnecessary for us to discuss the remaining issues.
REVERSED AND REMANDED.
MALONE, C.J., and STUART, PARKER, SHAW, MAIN, and WISE, JJ., concur.
WOODALL and MURDOCK, JJ., concur in the result.

. According to the documents in the record, Randall is the sole member of RGR, LLC; Martin is the sole member of TTM MB Park, LLC; and both Randall and Martin are the members of MB Park, LLC.

. The limited liability companies had been seeking a loan amount in excess of the $12,322,500 actual principal amount of the loan.

. Section 2.05(f) of the loan agreement provides:

. RGR made no argument in this motion as to the lack of “an adequate remedy at law” prong of the test for a preliminary injunction. Also, RGR made no argument in the motion regarding the "likelihood of success on the merits” of its fraud claims. See discussion of Holiday Isle, LLC v. Adkins, 12 So.3d 1173 (Ala.2008), in "Standard of Review,” infra.

. The issuance of a preliminary injunction is an appealable order. See 4(a)(1)(A), Ala. R.App. P.

. RGR asserted two counts of breach of contract in its counterclaim against Capmark. In the first count, RGR alleged that Capmark breached its agreement to provide the limited liability companies $300,000 in cash-flow funding. In the second count, RGR alleged that the limited liability companies had a pre-negotiation agreement with Capmark to participate in good-faith discussions regarding the status of the loan and that Capmark breached this agreement by exercising remedies under the loan documents without first terminating the prenegotiation agreement in writing. However, in support of its motion for a preliminary injunction, RGR argued that it had a reasonable likelihood of success on its claim alleging a breach of the agreement to provide $300,000 in cash-flow funding and, rather than arguing that it had a reasonable likelihood of success on its claim alleging a breach of the prenegotiation agreement, RGR argued that Capmark had breached an agreement to convert the loan from construction financing to permanent financing. Following a hearing on the motion for a preliminary injunction, a transcript of which is not contained in the record, the trial court found that RGR had established a reasonable likelihood of success on the merits of its breach-of-contract claim alleging a breach of the agreement to provide permanent financing. On appeal, the parties have framed the issue as being whether RGR had sufficiently demonstrated that it had a reasonable likelihood of success on the merits of its breach-of-contract claim alleging a breach of the agreement to provide permanent financing. Although it is not entirely clear from the record, it appears that RGR has abandoned its breach-of-contract claim alleging a breach of the prenegotiation agreement and amended its pleadings pursuant to Rule 15, Ala. R. Civ. P., to assert the claim alleging a breach of an agreement to provide permanent financing. Accordingly, we will analyze this element of the preliminary injunction based on the alleged breach of the agreement to provide permanent financing.

. Assuming the alleged agreement obligating Capmark to provide the limited liability companies cash-flow funding was a separate and collateral agreement definite in terms, we *1271 conclude that, based on the evidence contained in the record and the arguments presented by the parties’ on appeal, such an alleged agreement would violate § 8 — 9—2(7), Ala.Code 1975, and would be unenforceable. However, because we have concluded that RGR has not established the existence of a separate and contemporaneous agreement, we need not address this issue in detail.

. As stated above, RGR also asserted fraud claims in its counterclaim. However, in its motion for a preliminary injunction RGR offered little to no argument that it had a reasonable likelihood of success on the merits of its fraud claims. In the trial court’s order granting the preliminary injunction, an order drafted by RGR, the trial court made no finding as to the reasonableness of RGR’s likelihood of success on the merits of the fraud claims. We, as an appellate court, cannot address this question without the trial court in the first instance having ruled upon the issue. See Smith v. Smith, 928 So.2d 287 (Ala.Civ.App.2005) (holding that a trial court should not be held in error for matters that it neither ruled upon nor was provided the opportunity to rule upon).