T.C. Memo. 2012-60

UNITED STATES TAX COURT

TONDA LYNN DICKERSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20029-08.                    Filed March 6, 2012.

P, a waitress, received from a customer a winning lottery ticket from the prior night's Florida lottery drawing although the ticket's winning status was at the time apparently unknown to the customer. P and members of her family formed a corporation to claim the proceeds. P held 49% of the stock. Members of her family held the remaining stock. R alleges P's family members, because they owned 51% of the stock, received a gift when P signed the winning ticket as president of the corporation and submitted it to the Florida lottery as the corporation's property. P claims it was not a gift because a long-standing enforceable agreement existed among her family that mandated she share the winning proceeds with them, or because P and her family members were members of an existing partnership that was the true owner of the ticket.

Former coworkers of P filed suit against P claiming that they had a preexisting agreement with P to share the proceeds of any winning lottery ticket received as a gift or tip from a customer. An Alabama trial court sided with the coworkers, but that decision was ultimately overturned by the Alabama Supreme Court. P argues in the alternative that if a gift did occur, then the value of the gift should be discounted.

Held: P made a 1999 gift of a 51% share of her interest in the winning lottery ticket. The discounted taxable value of the gift was $1,119,347.90.

David M. Wooldridge, Donald Eugene Johnson, Gregory P. Rhodes, and Ronald A. Levitt, for petitioner.

Horace Cump and Edwin B. Cleverdon, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge: This case is before the Court on a petition for redetermination of a $771,570 gift tax deficiency for the tax year 1999. There are two issues. First, did petitioner make a taxable gift when she contributed a winning lottery ticket to a newly formed corporation in which she owned only 49% of the stock and other family members owned the rest? Second, if petitioner did make a gift, what was the value of the gift?

# FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. Petitioner resided in Alabama at the time she filed her petition.

I.      She's Got a Ticket To Ride

Petitioner is a former waitress of the Waffle House in Grand Bay, Alabama. Edward Seward was a regular customer, coming to the Waffle House almost daily. Mr. Seward had a reputation of giving away lottery tickets, frequently giving tickets to individuals including petitioner and her coworkers. As Alabama did not have a lottery, Mr. Seward would travel to neighboring Florida to procure the tickets.

On March 7, 1999, Mr. Seward went to the Waffle House and, while there, handed petitioner an envelope containing a lottery ticket. Unbeknownst to Mr. Seward at that time, the ticket he gave petitioner was one of two winning tickets that had been drawn for the Saturday evening, March 6, 1999, drawing of the Florida Lotto Jackpot. The ticket was, if paid out over 30 years, valued at $10,015,000, with a cash payout amount of $5,075,961.71.[1] Petitioner was not Mr.

---

[1]The record does not reveal how the lottery ticket's value was determined. We note that the prize awarded was $354,000 payable per year for 30 years or $10,620,000 (i.e., $354,000 x 30).

Seward's waitress on March 7, 1999, and the parties agree the winning ticket was a gift, not a tip to petitioner.[2]

Petitioner did not open the envelope until shortly after she left work. At that time, she realized the numbers on her ticket matched the ones a coworker told her had been drawn the day before. Thinking someone was playing a joke on her, she called her father, Bobby Reece, and asked him to confirm whether she was indeed holding a winning ticket. He did and she was.

According to petitioner, when she realized she held a winning ticket, because of her family's prior existing agreements, "immediately I knew that I was sharing with my family." Which brings us to an integral aspect of this case--the alleged "Reece Family Agreement".

II.    Family Values

According to petitioner, "it was well-known that we were in to lotteries." The Court will take judicial notice that the Florida lottery began on January 18, 1988. Shortly thereafter, Mr. Reece began a tradition of buying lottery tickets using petitioner's, her sister's, and her brother's birthdays as the number sequence. Petitioner obtained her first lottery ticket in high school, when she and her brother,

_____

[2]Apparently, respondent did not assert Mr. Seward owed income tax on the winning lottery ticket or gift tax for giving the winning lottery ticket to petitioner.

Johnny Reece, started giving their father money so that he could purchase tickets on their behalf (one must be 18 to legally purchase a ticket).

At trial petitioner stated: "our family had always talked about if anyone had won any big amount of money in a lottery, that we would take care of each other or share in the family". Similarly, Mr. Reece and Johnny also testified extensively about the sharing attitude of the Reece Family and the alleged lottery proceeds sharing agreement.

While the Court concludes there was a general vague lottery proceeds sharing agreement, this sharing agreement was never written down and there is no documentation to support its existence or its terms. There was never an understanding that each family member had to buy a certain number of tickets (or even buy tickets at all). Johnny, for example, stated he does not "regularly participate or even think of it * * *. Just whenever I think about it, at a convenience store, I might pick up five bucks here and there, nothing standard or any kind of pattern." In fact, from the record, it appears that the only family member who frequently bought lottery tickets was Mr. Reece.

Before the winning ticket at issue here, there were never any discussions or consistent course of dealing about specific percentages each family member would get of any winning ticket. When questioned at trial, petitioner stated there were no

specifics and that they "just said that we would share, we would take care of each other."

There is no doubt that the Reece family was a very close and sharing family. Mr. Reece prepares all of the family members' tax returns. The family gathers at Mr. and Mrs. Reece's house almost daily. When petitioner first married and moved to Mississippi for a short time, she would still return to her parents' house, which she characterized as "the hub of our family", almost every day.

Mr. Reece once won $80 and took the Reece family to dinner. And there are more examples of the family's sharing attitude. In 1996 Mr. and Mrs. Reece bought approximately 6-1/2 acres of land. Mr. Reece took the acreage and plotted it out into four equal lots so that he and Mrs. Reece as well as each child would have a plot on which to build a house or place a mobile home. Then there is the per diem. Mr. Reece traveled for work, receiving a per diem for food while away. He would do his own cooking in order to save money; and the per diem he did not use he divided among his children.

True to these sharing beliefs, after petitioner realized she held the winning ticket, she wanted to share it. And conversations immediately started taking place among certain members of the Reece family about how they were going to "split

the money". But just how could this be accomplished? She turned to her father for advice.

III.    "Inc."-ing the Deal

On Monday, March 8 (after learning on the previous day that his daughter had won the lottery), Mr. Reece contacted Louisa Warren, the general counsel for the Florida Lottery Commission. Ms. Warren told Mr. Reece: "Don't sign that ticket, period. Don't sign the ticket", and she further stated that a single entity would have to be formed to claim the prize for the family. Because of Ms. Warren's express instructions not to sign the ticket, petitioner put the ticket away while her father decided what to do.

Immediately after talking to Ms. Warren, Mr. Reece called Dwight Reid, a lawyer he had consulted before. That same day, Mr. Reid prepared incorporation papers for an S corporation to be named 9 Mill, Inc. (9 Mill). Also on March 8, a meeting of the prospective family stockholders of 9 Mill was held and shares of stock in the proposed corporation issued in the following percentages:

| Shareholder | Percentage Owned |
|---|---|
| Tonda and James Dickerson (jointly) | 49 |
| Cynthia Reece[1] | 17 |
| John A. & Lorie A. Reece (jointly)[2] | 17 |
| Larry L. & Jennifer D. Pierce (jointly)[3] | 17 |

[1]Cynthia Reece is petitioner's mother.
[2]John A & Lorie A. Reece are petitioner's brother and sister-in-law.
[3]Larry L. and Jennifer D. Pierce were petitioner's sister and brother-in-law.

From the record it is evident that it was Mr. Reece who determined these percentages, not petitioner and not the Reece family as a group. Mr. Reece himself stated that he was the one who worked out the percentages and that he did it at his kitchen table alone while petitioner and her then husband, James Dickerson,[3] were looking at automobiles. Once he determined the percentages, Mr. Reece told Mrs. Reece, petitioner, and Mr. Dickerson, stating at trial that

> Tonda and I and Tonda's husband and my wife were discussing at the table, and we were talking about -- I had figured out that I was making at that time 50,200, something like that, $52,000 a year, at my company, my income, and I took the nine million and a percentage to get around that amount, and I said that's what the kids should get, and if they couldn't live on that, I'm sorry.

The reasons petitioner and Mr. Dickerson received 49% appear twofold: (1) so no one person had majority ownership and control and (2) so petitioner

---

[3]Petitioner and Mr. Dickerson's marriage had been dissolved by the time of trial.

could help her husband's family and Mr. Seward (apparently he wanted a new truck).

The articles of incorporation for 9 Mill were signed on Thursday, March 11, by petitioner, Mr. Dickerson, and Mrs. Reece. On March 18, 1999, the articles of incorporation were filed with the Alabama secretary of state. On May 10, 1999, a savings account was opened at Mobile County Bank in the name of 9 Mill with petitioner, Mr. Dickerson, and Mrs. Reece listed as having signatory power in the account and with two signatures being required to withdraw funds from the account.

## IV. Eye on the Booty

The rules of the Florida lottery required all tickets valued over $599 to be claimed at the lottery headquarters. On Friday, March 12, petitioner, Mr. Dickerson, and Mr. and Mrs. Reece met with Florida lottery officials. Petitioner signed a Florida Lottery Winner Claim Form, claiming the lottery prize in the name of 9 Mill as president of the corporation. Petitioner also signed a Winner Claim Form Addendum on behalf of 9 Mill, making an irreversible election to receive the lottery winnings in 30 annual installments of $354,000 each, with the first annual payment date being scheduled for June 2000. While there, petitioner, Mr. Dickerson, and Mr. and Mrs. Reece also signed an affidavit stating they knew

of the option to receive a lump-sum payout but that 9 Mill had elected to receive the prize in 30 annual installments.

That was not all the affidavit stated. It also stated that the Florida lottery had been notified of a competing claim to the winning lottery ticket. And on March 12, while in Tallahassee, the family was informed that no payment of the prize funds would be made until the disputed claim was resolved. That brings us to the quarrel over the ticket.

## V. House of Waffling

Petitioner wanted to share with her family. Her coworkers at the Waffle House wanted her to share with them. In fact, they thought she was obligated to share with them because they had all agreed to split lottery winnings if any of them won. Petitioner first explicitly learned of this spat on Tuesday, March 9, when Sandra Deno called her claiming that petitioner was a party to a pooling agreement with other employees at the Waffle House.

Ms. Deno and three other Waffle House employees then obtained counsel, Stephen E. Clements. On or about March 11, 1999, but in any event before the prize was awarded, Mr. Clements, the lawyer representing the four former coworkers (Waffle House claimants), called Ms. Warren and informed her that a dispute existed regarding the proceeds of the Lottery ticket and that his clients

were entitled to 80% of the proceeds. He followed up with a letter dated March 12 and sent by facsimile on March 15, 1999, which stated in part: "We would request that no commitments concerning distribution nor actual distribution of any funds be made to Ms. Dickerson or any person or firm on her behalf until such time as the issue of actual ownership of said ticket can be resolved between the parties".

On March 18, 1999, while petitioner was filing the articles of incorporation for 9 Mill with the Alabama secretary of state, Mr. Clements was initiating a lawsuit on behalf of the Waffle House claimants in the Circuit Court of Mobile County, Alabama (Waffle House complaint).[4] The Waffle House complaint requested, among other relief, that the court determine that a valid joint ownership

---

[4]Respondent initially objected to the introduction of the Waffle House Complaint on the grounds of materiality, relevance, and hearsay. At trial petitioner orally stipulated that the Waffle House complaint was not being offered for the truth of the allegations made by Mr. Clements but was "simply being offered for the fact that those assertions and those statements were made in the Circuit Court of Mobile County on or about the 18th of March, 1999." Thereafter, respondent withdrew his objection.

In addition to objecting to the introduction of the Waffle House complaint, respondent also objected to numerous other stipulated facts regarding the lawsuit on the grounds of materiality and relevance. Fed. R. Evid. 401 defines "Relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." These stipulated facts will be admitted and respondent's objections are overruled. These facts are both relevant and material in determining the value of the lottery ticket on the date petitioner gave it to 9 Mill and have proven to be helpful to the Court.

agreement had been entered into between the Waffle House claimants and petitioner and asserted that the Waffle House claimants were entitled to 80% of the proceeds of the lottery ticket.

On March 19, 1999, the Circuit Court of Mobile County ordered that all parties refrain from any further efforts to collect, or attempt to collect, any funds from the State of Florida Department of Lottery which, were, or might be, the subject of the tiff. On April 30, 1999, after a trial before an advisory jury, the Circuit Court of Mobile County entered an order finding that the Waffle House claimants had a valid and enforceable joint ownership agreement with petitioner and that they were entitled to 80% of the proceeds of the lottery ticket or $4,060,769.20. Pursuant to the order of the Circuit Court of Mobile County, Alabama, to pay this amount, less any necessary Federal or State tax withholdings, into that court, the Florida Lottery Commission paid $2,923,753.82 into the Circuit Court of Mobile County.

On May 26, 1999, 9 Mill filed a notice of appeal with the Alabama Supreme Court. On February 18, 2000, the Alabama Supreme Court reversed the trial court. Dickerson v. Deno, 770 So. 2d 63, 67 (Ala. 2000). The Alabama Supreme Court concluded that while the Waffle House claimants had presented sufficient evidence to support a finding that an oral agreement existed, the agreement was

unenforceable on public policy grounds because it was "founded on gambling consideration". See Ala. Code sec. 8-1-150 (LexisNexis 2002).

After the decision of the Alabama Supreme Court was issued, Mr. Clements threatened an appeal to the United States Supreme Court and also raised the issue of a payout to his clients in exchange for their promise not to talk to the media. On December 8, 2000, Mr. Seward filed a complaint in the Circuit Court of Mobile County alleging that petitioner had breached her agreement to share the proceeds with the Waffle House claimants and that therefore he was entitled to the full proceeds. Sometime in December 2000, the Circuit Court of Mobile County entered an order denying his claim. Mr. Seward appealed to the Alabama Supreme Court, which affirmed the circuit court on September 20, 2002. See Seward v. Dickerson, 844 So. 2d 1207 (Ala. 2002).

VI. Looking a Gift Horse in the Mouth

Petitioner did not file a gift tax return for the 1999 tax year until she was asked to by Toya Sue Washington, an attorney in the Estate Tax Division of the Internal Revenue Service (IRS). Petitioner's Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, which was received on October 30, 2007, reported that no taxable gift had been made. The IRS disagreed with petitioner and alleged she had made a gift of $2,412,388 as a consequence of her

transfer of the lottery ticket to 9 Mill.[5]  Respondent thereafter issued a notice of

deficiency dated July 1, 2008, determining a gift tax deficiency of $771,570.  On

behalf of petitioner, Mr. Reece timely filed a petition with this Court.  Trial was

held on May 26, 2010, in Mobile, Alabama.

## OPINION

I.    Burden of Proof

In general, the Commissioner's determinations are presumed correct, and the

taxpayer bears the burden of proving that they are incorrect.  Rule 142(a);

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering,

290 U.S. 111, 115 (1933).[6]  However, if in any court proceeding a taxpayer

introduces credible evidence with respect to any factual issue relevant to

ascertaining the taxpayer's liability for any tax imposed by subtitle A or B of the

Internal Revenue Code and meets certain other requirements, the burden with

---

[5]Respondent apparently determined the amount of the gift was $2,412,388 on the basis that the full present value of the installments due to be paid to the undisputed owner of the lottery ticket was $4,730,172 (51% of which is $2,412,388).  On brief, the parties agree that without taking into consideration the dispute over ownership, the full present value of the lottery ticket was $4,730,172. We accept this but note that the record does not reveal how $4,730,172 was calculated.

[6]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

respect to that factual issue shifts to the Commissioner. Sec. 7491(a). In her reply brief petitioner asserts for the first time that section 7491(a) shifts the burden of proof to respondent.

Petitioner did not assert in her pretrial memorandum or at trial that respondent bears the burden of proof. Generally, we will not consider an issue that is raised for the first time on brief. Estate of Aronson v. Commissioner, T.C. Memo. 2003-189 n.5 (citing Foil v. Commissioner, 92 T.C. 376, 418 (1989), aff'd, 920 F.2d 1196 (5th Cir. 1990)). Additionally, by not even raising the issue in her opening brief, petitioner has given respondent no opportunity to address this issue. Petitioner's attempt to first raise the issue of section 7491 on reply brief is untimely and prejudicial to respondent. See Kansky v. Commissioner, T.C. Memo. 2007-40.

Regardless, we do not need to decide who bears the burden of proof because the parties have provided sufficient evidence for us to determine both that a gift occurred and the value of that gift, and that determination is unaffected by the burden of proof. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005); Trout Ranch, LLC v. Commissioner, T.C. Memo. 2010-283.

> "In a situation in which both parties have satisfied their burden of production by offering some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion,

proof, or preponderance. * * * Therefore, a shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie. * * *"

Knudsen v. Commissioner, 131 T.C. 185, 188 (2008) (quoting Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212); see also Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998) (holding that the allocation of the burden of proof was immaterial because the Court's conclusions were based on the preponderance of the evidence).

II.    Whether a Taxable Gift Occurred

Section 2501(a)(1) generally imposes a tax for each calendar year on the transfer of property by gift during such year by an individual.  The tax imposed by section 2501 applies whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible.  Sec. 2511.  Section 25.2511-1(h)(1), Gift Tax Regs., provides that a transfer of property to a corporation for less than adequate consideration represents gifts to the other individual shareholders of the corporation to the extent of their proportionate interests.  See Holman v. Commissioner, 130 T.C. 170, 184-185 (2008), aff'd, 601 F.3d 763 (8th Cir. 2010); Shepherd v. Commissioner, 115 T.C. 376 (2000), aff'd, 283 F.3d 1258 (11th Cir. 2002); see also Estate of Sharp v. Commissioner, T.C. Memo. 1994-636 (stating that "[w]hen property is transferred

for less than adequate and full consideration, the amount by which the value of the property exceeds the value of the consideration shall be deemed a gift").

The arguments are straightforward. Respondent contends that petitioner's transfer of the lottery ticket to 9 Mill was an indirect gift to the extent that 51% of the shares of 9 Mill were, at the time transfer of the lottery ticket took place, owned by petitioner's mother, brother, sister, sister-in-law, and brother-in-law.[7] Petitioner argues that no taxable gift occurred because at the time of the lottery ticket transfer there had previously existed and remained in effect a binding and enforceable contract under Alabama State law requiring the transfer, or, alternatively the family members and petitioner were all members of an existing partnership under Federal tax law which was the true owner of the lottery ticket or its proceeds.[8] We address each of petitioner's arguments in turn.

---

[7]Petitioner's retention of 49% of 9 Mill with her then husband resulted in no taxable gift. Sec. 2523 provides: "Where a donor transfers during the calendar year by gift an interest in property to a donee who at the time of the gift is the donor's spouse, there shall be allowed as a deduction in computing taxable gifts for the calendar year an amount with respect to such interest equal to its value."

[8]Petitioner contends there are "four distinct and alternative arguments" as to why no taxable gift occurred:

1)      There was a pre-existing, binding and enforceable agreement among the Reece Family to share in any lottery tickets acquired by any of them * * *

(continued...)

A.    <u>Whether a Binding and Enforceable Contract Existed Under Alabama State Law</u>

"State law controls the determination of the nature of the property interest the taxpayer conveyed."  <u>Musgrave v. Commissioner</u>, T.C. Memo. 2000-285 (citing <u>United States v. Nat'l Bank of Commerce</u>, 472 U.S. 713, 722 (1985)); <u>see also</u> <u>Estate of Watts v. Commissioner</u>, 823 F.2d 483, 485 (11th Cir. 1987) (stating that while "valuation of an interest in property for federal tax purposes is

---

[8](...continued)

2)    There was a pre-existing agreement among the Reece Family sufficient to form a partnership for federal tax purposes, * * *

3)    There was a pre-existing, binding agreement among the Reece Family that provided sufficient terms and specificity to be enforced under state law, <u>but</u> the agreement may not have been enforceable under Alabama's anti-gambling statute.  In this situation, Tax Court precedent is clear that such an agreement - even though enforcement is barred for some reason - is sufficient to avoid there being a taxable gift under federal tax law.  * * *

(4)    There was a pre-existing agreement or understanding among the Reece Family members although some terms of that agreement might not be sufficiently clear to allow enforcement under state law.  Nevertheless, Tax Court precedent supports a finding under federal tax law that no taxable transfer occurred, if there was an intention to share the proceeds and that intention was implemented

While petitioner characterizes these arguments as distinct, we believe they can be condensed into two arguments:  (1) the alleged agreement was enforceable under State law and therefore resulted in no taxable gift and (2) even if not enforceable under State law, the alleged agreement resulted in no taxable gift pursuant to Federal tax law.

a question of fact * * * state law determines precisely what property is transferred"), aff'g T.C. Memo. 1985-595; Mitchell v. Commissioner, 131 T.C. 215, 218 (2008) (stating State law determines the nature of a property interest and Federal law determines the Federal taxation of that property interest). In order to determine whether a valid contract existed between the Reece family members and petitioner, we must look to Alabama State law. If so, petitioner did not make a gift by sharing the lottery proceeds with her family pursuant to her contractual obligations.

The elements of a valid contract in Alabama are: (1) an agreement, (2) consideration, (3) two or more contracting parties, (4) a legal object, and (5) capacity. Shirley v. Lin, 548 So. 2d 1329, 1332 (Ala. 1989). Respondent asserts that "The elements of agreement, consideration and a legal object render the Reece family Agreement (contract) too vague and indefinite to enforce." Petitioner concedes that a material term of the agreement (the specified percentages each family member would get) was not stated but argues that the Reece family's history of equally dividing assets and money is evidence of their intention to share, citing the division of the family lot in southern Alabama into

four plots and the equal sharing of Mr. Reece's leftover per diem pay as examples.[9]

Whether the terms of an agreement are sufficiently definite for it to constitute an enforceable contract is a question of law to be determined by the court. White Sands Group, L.L.C. v. PRS II, LLC, 998 So. 2d 1042, 1052-1053 (Ala. 2008). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Id. at 1051.

While "'the law does not favor, but leans against the destruction of contracts because of uncertainty; it will, if feasible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained.' But * * * the court 'cannot set up a contract for the parties'." Smith v. Chickamauga Cedar Co., 82 So. 2d 200, 202 (Ala. 1955) (citations omitted); see also Cook v. Brown, 393 So. 2d 1016, 1018 (Ala. Civ. App. 1981) (stating that "a trial court should not attempt to enforce a contract whose terms are so

---

[9]Petitioner does not attempt to explain why if their intent was to share equally, they did not share the proceeds of the winning ticket equally. Nor does she address the issue of whether, if an enforceable agreement to share equally did in fact exist, her family made a gift to her by allowing her to hold 49% of the stock instead of an equally divided percentage.

indefinite, uncertain, and incomplete that the reasonable intentions of the contracting parties cannot be fairly and reasonably distilled").

We agree with respondent. The "terms" of the so-called Reece family agreement consist solely of offhand statements made throughout the years about sharing and taking care of one another in the event someone came into a substantial amount of money. This is not enough. There was no requirement that each family member buy lottery tickets. There was no pattern. There was no pooling of money. There were no predetermined sharing percentages. And while both petitioner and Mr. Reece testified that the agreement covered only "substantial" winnings, neither gave any indication as to what "substantial" was defined as.

Who was party to the agreement was also vague. Mr. Reece stated that the agreement included himself and his wife, his three children, and their spouses. Yet when asked what would have happened if his son-in-law had bought a winning ticket by himself, specifically whether this ticket would have been included in the deal, he stated: "Knowing this gentleman, I would assume, yes, it would be in the agreement." This testimony is simply further evidence of the very sharing nature of petitioner's family. But a feeling of moral obligation to take care of one's family and a few statements that one would do so in the

hypothetical situation that one won the lottery simply does not rise to the level of an enforceable contract. What the family had at best was an unenforceable contract to agree on something if in fact one of them was the recipient of a substantial lottery prize.[10]

The actions taken by petitioner and Mr. Reece after petitioner realized she had won the lottery also support a finding that all that existed was petitioner's desire to share her good fortune with her family. Conversations took place, but instead of collaborative discussions, Mr. Reece told the family what he had decided should happen. Not only did petitioner's sister and brother and their spouses not take an active role in these conversations; they did not travel to Florida to claim and celebrate their shared winnings. Petitioner, Mr. Dickerson, and Mrs. Reece were the only three listed as having signatory power over 9 Mill's bank account. And it is curious to this Court that the lottery proceeds were not divided equally if the family's intention was to share equally (as indicated by

---

[10]At most, the family had an "agreement to agree". It is established that these are not enforceable. See Clanton v. Bains Oil Co., 417 So. 2d 149, 151 (Ala. 1982); see also Capmark Bank v. RGR, LLC, __ So. 3d __, 2011 WL 4507555, at *11 (Ala. Sept. 30, 2011) (stating that "a contract that 'leav[es] material portions open for future agreement is nugatory and void for indefiniteness'". (internal cites omitted)).

petitioner's reference to how her family shared equally in an $80 dinner and Mr. Reece partitioned land into four equal lots).

Contrary to petitioner's belief, the terms of the alleged Reece family Agreement are too indefinite, uncertain, and incomplete for enforcement. See, e.g., Smith, 82 So. 2d at 202 (holding a contract giving one party "'an unlimited right to determine' the extent of its performance with respect to the furnishing of logs" was "too indefinite for legal enforcement"); Hunt v. Hammonds, 60 So. 2d 355, 356-367 (Ala. 1952) (holding a contract "to supply eight acres of land of an uncertain description" was void for uncertainty because it did not require one party to supply "any certain land"); Ricks v. Riddle Equip., Inc., 20 So. 3d 811, 814 (Ala. Civ. App. 2009) (holding an "agreement was too indefinite to constitute an enforceable contract" when it did not specify the amount of commission one party would be paid or a method for determining the amount or how long machinery would be stored in a building).[11]

---

[11]In contrast, an enforceable agreement to share was found to exist pursuant to the contract law of the District of Columbia in Pearsall v. Alexander, 572 A.2d 113 (D.C. 1990). In that case, unlike this case, evidence existed establishing an agreement between two men to share equally in the proceeds of a "jointly-purchased * * * [winning] lottery ticket." The two men had been friends for over 25 years and approximately twice a week would get together after work. Id. at 115. Together, they would go to a liquor store and purchase a "package" which consisted of vodka, orange juice, two cups, and two lottery tickets. Id. at 114. If a ticket ever won, the

(continued...)

Additionally, even if otherwise enforceable, the alleged Reece family agreement would be rendered void pursuant to Alabama's antigambling statute. See Barber v. Jefferson Cnty. Racing Ass'n, Inc., 960 So. 2d 599, 614 (Ala. 2006) (stating that "[i]t is 'the policy of the constitution and laws of Alabama [to prohibit] the vicious system of lottery schemes and the evil practice of gaming, in all their protean shapes'" (alteration in original)). Ala. Code sec. 8-1-150(a) provides in part: "All contracts founded in whole or in part on a gambling consideration are void.".

In Dickerson, 770 So. 2d. at 66-67, the case between petitioner and the Waffle House claimants, the Alabama Supreme Court stated:

> The alleged oral contract in this case was an exchange of promises to share winnings from the parties' individually owned lottery tickets upon the happening of the uncertain event that the numbers drawn in the Florida lottery matched the numbers on one of the tickets held by the five individuals. Consequently, the agreement between the parties was nothing more than an attempt by each of the five lottery-ticket holders to increase his or her odds of winning some portion of the Florida lottery. * * *

---

[11](...continued)
two would use the proceeds to purchase additional tickets. Id. On the night in question, two packages were purchased. Id. After the first package had been purchased, one man asked the other "are you in on it?" to which the other replied "yes". Id. The second package, which included a $20,000 winning lottery ticket, was then purchased a little later that day. Id. The court, looking at the longstanding pattern of conduct between the two and the exchanging of promises to share in the proceeds, held that there was an enforceable agreement to share 50-50. Id. at 117-118.

Consequently, we conclude that the agreement at issue here was "founded ... on a gambling consideration," within the meaning of that phrase in § 8-1-150 and that it was, therefore, void.

See also Choksi v. Shah, 8 So. 3d 288, 293 (Ala. 2008) (stating that in Dickerson, "an alleged contract [between petitioner and the Waffle House Claimants] to share lottery winnings was unenforceable because it was, at its core, based on illegal gambling").

In Dickerson, 770 So. 2d at 66-67, the Alabama Supreme Court differentiated between the Waffle House coworkers' situation and a situation where a ticket had been jointly purchased or held. See also Gipson v. Knard, 11 So. 482 (Ala. 1892) (situation involving "joint owners of a lottery ticket" held not to fall within then applicable antigambling statute). Petitioner uses this distinction to argue the Reece family agreement was different, stating:

> Unlike the alleged agreement with the Waffle House Claimants, Petitioner's contractual agreement or partnership with her family was a joint ownership agreement in which members of the Reece Family each 'jointly owned' all lottery tickets acquired pursuant to the agreement and/or by or for the members of the partnership. Such an agreement is different, as noted by the Alabama Supreme Court, than a 'side agreement [between individuals] to hedge their bets.' Dickerson v. Deno, 770 So. 2d 63, 66 (Ala. 200 [sic]). Accordingly, under established Alabama law, the Reece Family Agreement was a valid and enforceable agreement, and Tonda's transfer of the Lottery Ticket to 9 Mill, Inc. was not a 'gift' of the Lottery Ticket proceeds.

We disagree.  We fail to see how a lottery ticket given to petitioner by a customer at the Waffle House where she worked could metamorphose into a lottery ticket owned by petitioner's entire family.  Petitioner and her family did not pool their money to jointly purchase lottery tickets.  They did not keep lottery tickets individually purchased (or acquired) in a place where all family members had access to the tickets.  There is no evidence that a family member knew if another member had acquired a lottery ticket.  There was no agreement as to exactly how the proceeds of any winning ticket would be shared.  Mr. Reece testified that one reason petitioner and her then husband retained 49% of the stock in 9 Mill was that "Tonda is the one that received the ticket, so Tonda would get the larger amount." This statement directly contradicts petitioner's assertion that as soon as she received the ticket, it was "jointly owned" by her family.

In conclusion, there was no enforceable contract among the Reece family. First, the terms were too indefinite, uncertain, and incomplete.   Second, the alleged agreement, even if otherwise enforceable under contract principles, would be rendered void pursuant to the Alabama antigambling statute.

B.  Whether a Valid Partnership Existed Under Federal Tax Law

Whether a valid partnership exists for Federal tax purposes is governed by Federal law.  See Commissioner v. Culbertson, 337 U.S. 733 (1949); see also

<u>Connors v. Ryan's Coal Co.</u>, 923 F.2d 1461, 1466 (11th Cir. 1991).[12]   Section 761

defines the term "partnership" as

> SEC. 761(a). Partnership.--For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate. * * *

<u>See also</u> sec. 7701(a)(2).  The term "partnership" as defined by the Code is broader

in scope than the common law meaning of partnership and may include groups not

traditionally considered partnerships.  Sec. 1.761-1(a), Income Tax Regs.; sec.

301.7701-3(a), Proced. & Admin. Regs.

A partnership is created "when persons join together their money, goods,

labor, or skill for the purpose of carrying on a trade, profession, or business and

when there is community of interest in the profits and losses."  <u>Commissioner v.</u>

<u>Tower</u>, 327 U.S. 280, 286 (1946).  Generally, "each partner contributes one or

_____

[12]Sec. 704(e), entitled "Family Partnerships", was enacted in 1951 "to harmonize the rules governing interests in the so-called family partnership with those generally applicable to other forms of property or business".  S. Rept. No. 82-781 (1951), 1951-2 C.B. 458, 485.  Sec. 704(e)(1) provides:  "A person shall be recognized as a partner * * * if he owns a capital interest in a partnership in which capital is a material income-producing factor".  Our conclusion that no partnership exists among the Reece family is the same regardless of the applicability of sec. 704(e)(1) because we conclude there has been no showing that capital is a material income-producing factor.  For one court's discussion of the issues see <u>Pflugradt v. United States</u>, 310 F.2d 412 (7th Cir. 1962); see also <u>Evans v. Commissioner</u>, 447 F.2d 547, 550 (1971), <u>aff'g</u> 54 T.C. 40, 51 (1970).

both of the ingredients of income--capital or services." Commission v. Culbertson, 337 U.S. at 740.  In deciding whether two or more persons have formed a partnership:

> The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.  * * *

Id. at 742; see Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964).

Recognition of a partnership for Federal tax purposes also requires that the parties conduct some business activity.  See Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 514-517 (7th Cir. 1980), aff'g 72 T.C. 521 (1979).  For example, it is clear that neither joint ownership of property nor sharing of expenses, by itself, creates a partnership for Federal tax purposes.  Id.; sec. 1.761-1(a), Income Tax Regs.; sec. 301.7701-3(a), Proced. & Admin. Regs.; see also Marinos v. Commissioner, T.C. Memo. 1989-492.

Petitioner relies on Estate of Winkler v. Commissioner, T.C. Memo. 1997-4, to argue that a valid partnership existed.  Mr. and Mrs. Winkler had five children, all of whom lived relatively close to the Winklers' home where they would gather

almost every Sunday.  During 1989, because of his health, Mr. Winkler had to make frequent trips to medical clinics.  Normally, Mrs. Winkler and one of the five children would drive him to his appointments.

It quickly became a family routine that on trips to or from a clinic, whichever family members were in the car would purchase three Lotto tickets when they stopped for fuel.  Any family member who happened to have a dollar bill would contribute toward the purchase of the tickets, and the driver would usually go into the store to purchase the tickets.  After obtaining the tickets, the driver would hand them to Mr. Winkler, who would inspect them and comment on the numbers.  Mr. Winkler would then give them to Mrs. Winkler for safekeeping.  Upon returning home, Mrs. Winkler would invariably place the tickets in a glass bowl in a china cabinet where the Winklers stored most of their important family documents and keepsakes.  On Saturday night or Sunday morning, Mr. and Mrs. Winkler would check the numbers on the tickets against those selected during the weekly drawing.

Family members referred to the Lotto tickets purchased in the manner described above as "family tickets", and regarded them as being owned by the entire family.  * * * The Winklers had no specific agreement as to how any potential winnings would be divided among them.  However, the Winklers often discussed what they would do with any winnings, and each family member enjoyed describing what he or she would do with his or her separate portion of the winnings.  In this way, the purchase of Lotto tickets became a diversion for the family during Mr. Winkler's illness.

* * * Some of the Winkler children occasionally purchased Lotto tickets for themselves, and considered such tickets to be their separate property.  The children always kept Lotto tickets purchased for themselves in their separate possession.  On the other hand, when a family member purchased family tickets, he or she always purchased three tickets and always gave them to Mrs. Winkler for storage in the china cabinet.

One day, Mrs. Winkler, while with one of her daughters, purchased a ticket and put the ticket in the china cabinet. That Sunday, Mrs. Winkler realized the ticket was the winning ticket and immediately called each of her children and asked them to come to her home. Together, the family first met with an accountant and then an attorney to determine what to do with the winning ticket. Together, they decided the percentages each family member should receive.

We held that a valid partnership existed in Estate of Winkler, stating that

> based upon the credible testimony of * * * [the taxpayers'] witnesses, we find that the Winklers engaged in the activity of pooling their money to purchase family Lotto tickets. We find that they conducted this activity on a regular and consistent basis for more than a year before March 4, 1989. Thus, based upon all of the facts and circumstances of this case, we find that the Winklers in good faith and acting with a business purpose intended to join together in the present conduct of an enterprise. * * * We do not find the absence of * * * [a partnership] agreement to be fatal to the existence of a partnership prior to the time Mrs. Winkler purchased the winning ticket. * * *

We also noted that each member of the family was treated at a partner at all times including attending the meetings with the accountant and the attorney and having a say in formulating the agreement.

Petitioner argues that "The facts of Winkler and the present case have many similarities." There are some factual similarities, but there are also factual differences which in this case are important to a proper resolution of the issues.

The Winkler family had an established pattern of buying tickets on their way to and from medical clinics. In the words of the Court, they "conducted this activity on a regular and consistent basis". Id. The only regular and consistent activity with lottery tickets in the case at hand was Mr. Reece's purchase of the tickets using his children's birthdays as the number sequence and for a short period Mr. Seward's giving away of tickets.

Each member of the Winkler family met with the accountant and the attorney after they discovered they had a winning ticket. This did not happen in the Reece family. In the Reece family, it was Mr. Reece who ultimately made the decisions, not a joint effort among all of the family members. Petitioner and her family have nothing to rely on other than a family meal, offhand statements throughout the years, and a familial sense of duty to take care of each other.[13] This is simply not

_____

[13]We faced a second factual question in Estate of Winkler--whether Mrs. Winkler was acting on behalf of the partnership when she purchased the ticket. Courts typically focus on the facts and circumstances surrounding the purchase of a lottery ticket, including the intent and understanding of the parties at the time of purchase, to determine ownership of the proceeds of the ticket for income tax purposes. See, e.g., Tavares v. Commissioner, 275 F.2d 369, 371 (1st Cir. 1960), aff'g 32 T.C. 591 (1959).

The rule regularly applied in such circumstances is that where a ticket on a lottery is purchased in the name of one or two persons and they agree prior to the drawing to share any winnings, each person is taxable only upon his agreed share provided that the nominal owner in fact divides the proceeds in

(continued...)

enough to find that a partnership existed and that it was the owner of the gifted

winning ticket.

III. Value of the Gift

Petitioner having made a gift in 1999 when she transferred the lottery ticket to

9 Mill, we must now determine the amount of the gift.[14]  The amount of a gift of

property is the value of the property at the date of the gift.  Sec. 2512(a).  It is the

---

[13](...continued)
accordance with their agreement, even though the agreement be void and
unenforceable. * * *

Estate of Winkler v. Commissioner, T.C. Memo. 1997-4 (citing Dowling v.
Commissioner, T.C. Memo. 1959-169).  We concluded Mrs. Winkler was acting on
behalf of the partnership when she purchased the lottery ticket, stating:

> The facts in this case are that Mrs. Winkler did not normally play games of
> chance, and she never purchased Lotto tickets other than the family tickets
> purchased in the presence of other family members.  She purchased the
> winning Lotto ticket as one of three "family tickets" on March 4, 1989, while
> she was with her daughter, Charlotte.  She took the tickets home and placed
> them in a glass bowl in the china cupboard, as was customary for family
> tickets.

Even if we concluded there was a partnership among the Reece family involving the
purchase of lottery tickets, petitioner (unlike Mrs. Winkler) was not acting on behalf
of the partnership when she was given a lottery ticket.

[14]The unified credit available to a transferor in 1999 was $211,300, or an
applicable gift tax exclusion of $650,000 of taxable gifts.  See sec. 2010(c), before
enactment of the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub.
L. No. 107-16, 115 Stat. 38, on June 7, 2001.  The annual exclusion for gifts in
1999 to any one person was $10,000 pursuant to sec. 2503(b).

value of the property passing from the donor that determines the amount of the gift. Sec. 25.2511-2(a), Gift Tax Regs. "The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having a reasonable knowledge of the relevant facts." Sec. 25.2512-1, Gift Tax Regs.

In general, for Federal tax purposes property is valued as of the valuation date on the basis of facts available on that date without regard to hindsight. Bergquist v. Commissioner, 131 T.C. 8, 17 (2008); see also Goodman v. Commissioner, 156 F.2d 218, 219 (2d Cir. 1946), aff'g 4 T.C. 191 (1944); Estate of Davis v. Commissioner, T.C. Memo. 1993-155. This Court has adopted the rule that "subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation." Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987); see also First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985).

Here, the date of valuation is at issue. Respondent argues the gift was made on March 11, 1999. Petitioner argues the gift occurred on March 12, 1999. In her reply brief petitioner states: "Even if the transfer date was March 11, 1999, as Respondent argues, a hypothetical buyer researching the potential purchase of a $10

million dollar ticket would have discovered at a minimum, the claim made by the

Waffle House Claimants." We agree with petitioner.[15]

---

[15]We do note our conclusion that the gift occurred on March 12, 1999. The rules of the Florida Lottery 53 ER 98-16(8) state: "Until such time as a name is imprinted or placed upon the back of the lottery ticket in the designated area, a lottery ticket shall be owned by the physical possessor of such ticket." Mr. Reece credibly testified that pursuant to his conversation with Ms. Warren on Monday, March 8, 1999, petitioner placed the lottery ticket, unsigned, into a zip-lock bag. She then placed the zip-lock bag on her person and kept it there for the next few days. From the evidence in this case, the Court concludes she then took the lottery ticket out and signed it on March 12, 1999, when she claimed the winning proceeds in the name of 9 Mill. On the basis of this, we hold petitioner, by being in physical possession of the lottery ticket with no name imprinted on the back, owned it up until the moment on March 12, 1999, when she placed the name of 9 Mill on the ticket and signed it as president. At that time, 9 Mill owned the ticket, and petitioner had made a gift.

We recognize that in her petition, petitioner stated: "This was a transfer of a $5.00 lottery ticket to a legally formed family Sub-S corporation (Before it was claimed) under the direction of the legal department of the Florida Lottery, our corporate attorney, and the IRS". Petitioner, at the time she filed her petition, was proceeding pro se, and this statement is not necessarily inconsistent with a March 12, 1999, transfer date. The witnesses in this case were very forthright, credible, and honest. Petitioner is unsophisticated in matters concerning Federal tax laws, relying on others for advice. When Ms. Warren instructed Mr. Reece that no one should sign the back of the lottery ticket, we have no doubt petitioner followed those instructions and did not sign the ticket until March 12, 1999, immediately before it was formally presented to the Florida lottery officials.

Respondent asserts that "The use of the erroneous March 12, 1999, date would allow a whole new set of facts to be used and tend to send us down a slippery slope that would render the mandated date pursuant to IRS [sic] § 2512 meaningless." This might have been true if no evidence of a disagreement over who was entitled to the proceeds of the winning ticket existed before March 12. Respondent goes on to state that "The new facts as of March 12, 1999, was that some unknown claimants', possible hairdressers, attorney notified the Florida

(continued...)

Respondent argues that "at the most what was reasonably foreseeable was that one disgruntled co-worker might take legal action to obtain a portion of the lottery winnings. At this point no legal claims had been made, formally or informally, to the petitioner." Respondent then argues that no discount should be applied. Contrary to respondent's assertion, we cannot overlook that as of March 9 and certainly by March 11 or 12, a hypothetical buyer would have known of the potential cloud on title. See Estate of Sharp v. Commissioner, T.C. Memo. 1994-636. The hypothetical buyer would have then investigated the potential cloud on title before purchasing the lottery ticket. In that investigation, we have no doubt this hypothetical buyer would have determined a lawsuit was likely and would not have paid full value for the disputed portion of the lottery ticket. The question now is an appropriate discount.

---

[15](...continued) Lottery Commission that they had an interest in petitioner's lottery ticket." Mr. Clements called the Lottery Commission earlier on or before March 12, 1999, and it was known by a number of parties that there was a dispute as early as March 9, 1999. No knowledgeable reasonable buyer would have considered paying over $4 million for a lottery ticket without investigating the facts and receiving a warranty of good title after learning there was some dispute over ownership of 80% of the ticket proceeds.

In previous attempts to value claims subject to lawsuits,[16] this Court has started with the amount as if there was no contest and then discounted for (1) costs of litigation, (2) hazards of litigation, and (3) time delay in receiving funds. See Estate of Cobb v. Commissioner, T.C. Memo. 1982-571 (stating that any purchaser "would purchase that interest anticipating the possibility of litigation and would therefore discount the amount to be paid * * * by both the cost of litigation and litigation hazards").

The parties agreed in their briefs that the present value of the ticket proceeds, if there were no claims or discounts, was $4,730,172.[17]  For the reasons set forth below, we believe an appropriate discount for the 80% of the lottery ticket disputed by the Waffle House claimants is 67%.  Eighty percent of $4,730,172 is $3,784,137.6.  Applying a discount of 67% gives a value for the 80% disputed portion of the lottery ticket as of the date of gift of $1,248,765.41.  Fifty-one percent

---

[16]We acknowledge that as of March 11 and March12, suit had not yet been formally filed.

[17]We note this value differs from the trial record's indicated lump-sum cash prize payout value of $5,075,961.71.  The record does not explain the difference. Nevertheless, we will accept the parties' stipulated value as we lack a clean evidentiary basis for a substitution of our own value since we do not know what else is involved in the lump-sum cash payout election.

of this amount is $636,870.36. Fifty-one percent of the undisputed 20% is $482,477.54. Therefore, the total gift petitioner made is $1,119,347.90.

Steven Nicholas prepared an expert report for petitioner. Mr. Nicholas is a graduate of the University of Alabama School of Law and has been practicing law since his graduation in 1984 in Mobile where he specializes in litigation, principally commercial and class action litigation. Mr. Nicholas works for a law firm that is exclusively a plaintiffs' firm and earns fees on a contingency basis. In this regard, he has experience evaluating cases and claims in regard to the acceptance of cases on contingency basis and for settlement purposes. This is the first case where Mr. Nicholas has testified as an expert.

Mr. Nicholas testified that there were two sets of claims: (1) Waffle House claimants and (2) Reece family. For the first, he discounted by 65-80% (or to 20-35% of its otherwise FMV). For the first and second combined, he arrived at a total discount of 80-85% (arriving at a discounted FMV of 15-20% of undiscounted FMV). Finally, he testified that the costs of litigation would range between 2% and 5% of the total value of the ticket.

We start with the Waffle House claimants. Mr. Nicholas testified that the Waffle House case was an issue of first impression for the Alabama Supreme Court. He was of the opinion that as of March 11, 1999, the general consensus was that an

agreement between the Waffle House claimants was legal--specifically, that an agreement to share lottery proceeds was legal even in a State where gambling had been declared illegal. We found Mr. Nicholas' testimony very credible. He was knowledgeable regarding both Alabama law and the valuation of potential claims. We recognize our general rule not to look past the date of valuation to subsequent events, yet petitioner's loss in the trial court followed by an appeal and win at the Alabama Supreme Court (with two justices dissenting) confirms our own litigation tree analysis of just how uncertain the law was at the time the gift occurred. We find no sound reason and respondent has not established one to discredit Mr. Nicholas' opinion that the value of the lottery ticket should be discounted by 65-80% on the basis of the potential Waffle House litigation. We choose a discount of 65% because suit had not yet been filed when petitioner made the gift and we believe the lower amount of his range is more appropriate here. We note petitioner could have prevailed on either the factual contract claim on the basis that there was no agreement with the other Waffle House employees or the legal claim that the contract was illegal.

We now consider the Reece family claims. Petitioner states:

Mr. Nicholas asserted that if Petitioner had not complied with the Reece Family Agreement, more than likely the rest of the Reece Family Group would have prevailed in a lawsuit to enforce the agreement given the state of

Alabama law in 1999. * * * Based on the likelihood of success by the other members of the Reece Family, Mr. Nicholas further reduced his opinion of the value of Petitioner's winning ticket to 15 to 20 percent of its value as if undisputed.

Respondent argues: "Based on * * * analysis of the family agreement, the agreement is not an enforceable contract under Alabama law. The gift should not be discounted based on any family members' ability to sue the petitioner on the basis that they jointly owned the ticket." We agree with respondent. As discussed supra, there was no evidence of an enforceable contract or partnership among the Reece family. There is also no evidence that anyone other than the Reece family even knew of the alleged agreement or that any member of the family would have sued petitioner.

Lastly we address litigation costs. Mr. Nicholas testified that the cost of litigation would be 2-5% of the lottery ticket proceeds. Again, we find Mr. Nicholas' testimony credible and a 2% discount appropriate. We choose 2% because suit had not yet (and might never have) been filed at the time the gift occurred. In conclusion, the value of the disputed portion of the lottery ticket should be discounted by 67%.

The Court has considered all of petitioner's and respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.